# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## BRYSON CITY DIVISION
### 2:13cr2

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **EUDINE TRENE WILSON and** | ) | |
| **MARIE LUZINSKI RAYMOND,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

Pending before the Court are the Motions to Suppress [# 39 & # 42] filed by

Defendants. The Grand Jury returned a Bill of Indictment as to each Defendant

charging them with one count of possession with intent to distribute Oxycodone in

violation of 21 U.S.C. § 841(a)(1) and one count of conspiracy to possess with the

intent to distribute Oxycodone and other controlled substances in violation of 21

U.S.C. § 846. Defendants both move to suppress the evidence obtained as the

result of an October 11, 2012, traffic stop and the execution of a search warrant for

an apartment. Specifically, Defendants contend that the traffic stop and subsequent

warrantless search of their persons, as well as the search of the apartment, violated

their rights under the Fourth Amendment. On June 12, 2013, and June 20, 2013,

the Court conducted a hearing on the motions and heard evidence and the arguments of counsel. Having carefully considered the evidence, the briefs, the transcript of the hearing, and the arguments of counsel, the Court **RECOMMENDS** that the District Court **GRANT in part** and **DENY in part** the motions [# 39 & # 42].

## I.     Background

### A.     The September 18, 2012, Traffic Stop and Subsequent Investigation

In early 2012, the Cherokee Indian Police Department was investigating Kandace Griffin and Justina Rattler for selling Oxycodone. (Supression Hr'g Tr. 214, Jun. 20, 2013.) On September 18, 2012, Detective Matthew Shiver of the Cherokee Indian Police Department received a random tip from an individual that a young black female was at Griffin's residence at 404 Rock Hill Church Road, Cherokee, North Carolina, and that this female was a source of Oxycodone for Griffin. (Hr'g Tr. 216-18, Jun. 20, 2013) The information did not come from a paid informant, but the individual had provided Detective Shiver with reliable information in the past that resulted in three prior arrests. (Hr'g Tr. 217-18, 268-71, Jun. 20, 2013.)

Detective Shiver then asked Sergeant Daryl Dwayne Martin with the Cherokee Indian Police Department to drive by the Griffin residence and get a

vehicle description plus the tag number of the vehicle at the residence. (Hr'g Tr. 216, 218, Jun. 20, 2013; Supression Hr'g Tr. 5-6, Jun. 12, 2013.) Sergeant Martin drove by the Griffin residence that same day and observed a black vehicle with a New York tag. (Hr'g Tr. 6-7, Jun. 12, 2013.) After Sergeant Martin turned the vehicle information over to Detective Shiver, Detective Shiver ran the vehicle information through dispatch and discovered that it was a Hertz rental vehicle. (Hr'g Tr. 218-19, Jun. 20, 2013.) At some point on September 18, 2012, or September 19, 2012, a task force officer with the Drug Enforcement Administration then generated a subpoena, which was served on Hertz. (Hr'g Tr. 143, Jun. 12, 2013.)

In response to the subpoena, Hertz disclosed that an individual named David Delly had rented the black Mazda. (Hr'g Tr. 144, Jun. 12, 2013.) Agent Stites then investigated Delly and discovered an open investigation by the Department of Homeland Security regarding the trafficking of money through the Asheville airport. (Hr'g Tr. 144, Jun. 12, 2013.) In February of 2012, an agent with the Transportation Security Administration discovered over $30,000.00 in cash concealed in Delly's luggage. (Hr'g Tr. 144, 147, Jun. 12, 2013.) In addition, a dog at the airport alerted to the possible presence of a controlled substance. (Hr'g

Tr. 144, Jun. 12, 2013.)  Agent Stites, however, was not present at the airport at the time. (Hr'g Tr. 147, Jun. 12, 2013.)

Meanwhile, an individual called the Cherokee Indian Police Department, and dispatch requested that Sergeant Martin return the individual's call.  (Hr'g Tr. 18, Jun. 12, 2013.)  When Sergeant Martin called the phone number provided by dispatch, an individual who identified herself as Justina answered the phone.  (Hr'g Tr. 8-9, 19, Jun. 12, 2013.)  Sergeant Martin recognized the individual's voice as Justina Rattler based on dealings with her in the past.  (Hr.'g Tr. 20-22, Jun. 12, 2013.)  Rattler then asked Sergeant Martin what the police were doing at Kandace's residence.  (Hr'g Tr. 9, 19, 23, Jun. 12, 2013.)  Rattler also informed Sergeant Martin that a black female known as Baby D drives the black vehicle parked at the Griffin residence. (Hr'g Tr. 9, 19, Jun. 12, 2013.)   Rattler also told Sergeant Martin that this individual sold roxies (Hydrocodone tablet) to Griffin, and that she had personally bought roxies from Baby D on at least one occasion earlier in the year.  (Hr'g Tr. 10-12, 19, 23, Jun. 12, 2013.)  Finally, Rattler informed Sergeant Martin that Baby D was staying at a motel or cabin ten minutes from the residence, and that Baby D had pills and approximately $10,000 in cash in the residence.  (Hr'g Tr. 12, 19-20, Jun. 12, 2013.)   Rattler, however, did not know the address where Baby D was staying.   (Hr'g Tr. 25, Jun. 12, 2013.)

Sergeant Martin then relayed the information Rattler had provided him to Detective Shiver.  (Hr'g Tr. 27, Jun. 12, 2013; Hr'g Tr. 219-21, Jun. 20, 2013.)

The next day, officers for the Cherokee Indian Police Department kept a lookout for the black Mazda with New York tags on their way into work.  (Hr'g Tr. 221-22, Jun. 20, 2013.)   Detective Jeff Smith saw the black Mazda parked at the Maple Ridge Apartments as he was driving from Swain County to Cherokee. (Hr'g Tr. 222, Jun. 20, 2013; Hr'g Tr. 32, 53, Jun. 12, 2013.)  After pulling into the apartment's parking lot and writing down the tag number, Detective Smith passed the vehicle information on to another officer. (Hr'g Tr. 33, 55-56, Jun. 12, 2013.) The Cherokee Indian Police Department then set up surveillance on the black Mazda.  (Hr'g Tr. 33, 56, Jun. 12, 2013.)

While he was conducting surveillance of the black Mazda, Detective Smith saw a black female get into the vehicle and leave the apartment.  (Hr'g Tr. 34, 59, Jun. 12, 2013.)  Detective Smith then contacted Officer David Velez with the Cherokee Indian Police Department to let him know that the vehicle had left the apartment.   (Hr'g Tr. 34, 58, 99-100, 169, 170, Jun. 12, 2013.)  Detective Smith also told Officer Velez to try and find reasonable suspicion to pull the black Mazda over and identify the driver.   (Hr'g Tr. 58-59, 100, Jun. 12, 2013.)

Officer Velez proceeded to pull his vehicle alongside the black Mazda while

the highway was still a two lane road.  (Hr'g Tr. 170-71, Jun. 12, 2013.)  The officer sitting in the passenger seat indicated to Officer Velez that the driver of the black Mazda was not wearing her seat belt.  (Hr'g Tr. 171, 212, 215, Jun. 12, 2013.)  Officer Velez then pulled behind the black Mazda and activated his blue lights.  (Hr'g Tr. 171, Jun. 12, 2013.)  Once the black Mazda pulled over, Officer Velez approached the vehicle.  (Hr'g Tr. 171, Jun. 12, 2013. )

Officer Velez informed the driver of the black Mazda that he was pulling her over because she was not wearing her seatbelt.  (Hr'g Tr. 172, Jun. 12, 2013.)  The driver, however, stated that she was in fact in wearing her seatbelt. (Hr'g Tr. 172, Jun. 12, 2013.)  Officer Velez asked the driver for her license and had dispatch run the driver's license and license plate number.  (Hr'g Tr. 172, 212, Jun. 12, 2013.)  Officer Velez was able to identify the driver of the black Mazda as Defendant Wilson.  (Hr'g Tr. 171, Jun. 12, 2013.)  Because Defendant Wilson had a valid license and no outstanding warrants, Officer Velez allowed her to leave and did not issue her a citation.  (Hr'g Tr. 172, 213, Jun. 12, 2013.)  The entire incident lasted approximately ten to twelve minutes.  (Hr'g Tr. 172, Jun. 12, 2013.)

On September 20, 2012, Detective Shiver interviewed a confidential source about Defendant Wilson's interactions with Griffin and the sale of Oxycodone. (Hr'g Tr. 223, Jun. 20, 2013.)  Another officer introduced Detective Shiver to the

confidential source. (Hr'g Tr. 274, Jun. 20, 2013.) Although Detective Shiver had never used this source before, the other officer stated that he had been reliable and honest in the past. (Hr.'g Tr. 226, 274, 286, Jun. 20, 2013.) The source informed Detective Shiver that two black women would deliver pills for an individual known as Mr. Ed, including to Griffin. (Hr'g Tr. 224, Jun. 20, 2013.) Mr. Ed would also send two black Haitians with the women for protection. (Hr.'g Tr. 224, Jun. 20, 2013.) One of the women was known as Baby D, and she used the black Mazda rental car located at the Maple Ridge Apartments. (Hr'g Tr. 224-25, Jun. 20, 2013.) The source also advised Detective Shiver that Baby D carried a pistol, and that she would leave the pills in the apartment even when she was gone. (Hr.'g Tr. 225, Jun. 20, 2013.) Detective Shiver was able to identify Baby D as Defendant Wilson and Mr. Ed as David Delly. (Hr'g Tr. 227, 235, Jun. 20, 2013.)

## B. The October 11, 2012, Traffic Stop

On October 11, 2012, Detective Smith drove by the Maple Ridge Apartments on his way to work and saw a red Mazda sitting in approximately the same spot as the black Mazda had been sitting in September. (Hr'g Tr. 35, Jun. 12, 2013.) Detective Smith circled back to the Maple Ridge Apartments and wrote down the tag number for the red Mazda with a Louisiana license plate. (Hr'g Tr.

35, Jun. 12, 2013.)  Detective Smith passed the vehicle information on to Agent

Stites.  (Hr'g Tr. 35, 148, Jun. 12, 2013.)

Agent Stites then issued a second subpoena to Hertz, which revealed that the

red Mazda had been rented by David Delly at the Naples airport in Florida.  (Hr'g

Tr. 148-49, 152, 156-57, Jun. 12, 2013.)    Detective Shiver was also present when

Agent Stites received the information from Hertz.  (Hr'g Tr. 158, Jun. 12, 2013;

Hr'g Tr. 231-32, 276, Jun. 20, 2013.)  Agent Stites was able to confirm that the

David Delly who rented the red Mazda was the same individual who was currently

under investigation by the Department of Homeland Security by comparing his

date of birth, address, and phone number.  (Hr'g Tr. 161, Jun. 12, 2013.)  Agent

Stites also received a copy of the rental agreement, which did not list either Eudine

Wilson or Marie Raymond as authorized operators of the red Mazda. (Hr'g Tr.

157, Jun. 12, 2013; Gov.'s Ex. 2.)  In addition to receiving a copy of the rental

agreement, Agent Stites and Detective Shiver also spoke to a Hertz security

specialist in Virginia who is assigned the North Carolina region. (Hr'g Tr. 156,

166, Jun. 12, 2013.)  The security specialist informed Agent Stites and Detective

Shiver that there were no written user authorization forms contained in the

centralized Hertz computer system and that David Delly was the only authorized

driver of the vehicle.  (Hr'g  Tr. 167-68, Jun. 12, 2013.)  Agent Stites then

communicated this information to Detective Smith, who set up surveillance of the red Mazda.  (Hr'g Tr. 35, 158, Jun. 12, 2013; Hr'g Tr. 232, Jun. 20, 2013.)

In addition, a number of other police personal were contacted at the time in case one of the officers conducting the surveillance was able to make a traffic stop of the red Mazda.  (Hr.'g Tr. 232, Jun. 20, 2013.)  One of the officers contacted at the time was Detective Matthew Cox, a K-9 handler with the Graham County Sheriff's Office.  (Hr'g Tr. 78, 119, 232, Jun. 20, 2013; Hr'g Tr. 65, Jun. 12, 2013.)  Detective Smith asked Detective Cox to bring his K-9, Beck, because he might be needed later.  (Hr'g Tr. 65, Jun. 12, 2013; Hr'g Tr. 121, 176, Jun. 20, 2013.)

Officer Cox became a K-9 handler in October of 2011, and has worked with Beck since October 9, 2011.  (Hr'g Tr. 78, Jun. 20, 2013.)   Beck is trained to detect narcotics.  (Hr'g Tr. 79, Jun. 20, 2013.)  Specifically, Beck is trained to detect the odor of heroin, cocaine, and marijuana.  (Hr'g Tr. 87, Jun. 20, 2013.)  Beck, however, is not trained to detect pills, and a dog trained to detect heroin will generally not alert to Oxycodone pills.  (Hr'g Tr. 175, 317, 351, Jun. 20, 2013.)

Beck is a passive alert dog.  (Hr'g Tr. 157-58, 302, Jun. 2, 2013.)  He is trained to alert to the presence of narcotics by finding the strongest point of the scent or odor, getting as close as possible to that point, and then sitting and staring.

9

(Hr'g Tr. 94, 172-73, 303-04, Jun. 20, 2013.) The sitting and staring is Beck's final indication or final alert to the presence of narcotics, and Beck only receives a reward if he goes into this position. (Hr'g Tr. 94-95, 172-73, 182, 306, Jun. 20, 2013.) The handler is looking for this trained indication to alert him or her to the presence of narcotics. (Hr'g Tr. 308, Jun. 20, 2013.)

As a dog like Beck is searching for narcotics, he may also demonstrate changes in behavior as he conducts the search. (Hr'g Tr. 81, 306-8, Jun. 20, 2013.) The dog gets excited as he smells the narcotics and this tail may start to wag, his posture may change, or his breathing might change. (Hr'g Tr. 81-83, 94, 306-08, Jun. 20, 2013.) This is the step immediately before the dog gives his trained indication. (Hr'g Tr. 307, Jun. 20, 2013.) When a handler notices these changes in behavior, the handler would ordinarily walk the dog in the area where the change of behavior occurred in order to assist the dog to get closer to the source of the odor and give his final response if the dog is satisfied that narcotics are present. (Hr'g Tr. 135-36, 165, 307-09, Jun. 20, 2013.)

After getting the call from Detective Smith, Detective Cox loaded Beck into the vehicle and drove to the Hungry Bear gas station in Cherokee, which was the designated meeting place. (Hr'g Tr. 107, Jun. 20, 2013.) Detective Smith also contacted Sergeant Carla Neadeau with the Cherokee Indian Police Department

and told her that she might be needed later in the day to conduct a female search. (Hr'g Tr. 276-77, Jun. 12, 2013; Hr'g Tr.232, Jun. 20, 2013.)

William Reed, who was employed by the Swain County Sheriff's Office at the time, then set up surveillance of the red Mazda at the Maple Ridge Apartments. (Hr'g Tr. 36, 125, Jun. 12, 2013.)   Reed was in an undercover vehicle, which did not have blue lights.  (Hr'g Tr. 128-29, Jun. 12, 2013.)  Around noon, Reed witnessed two black females exit the apartment and get into the red Mazda.  (Hr'g Tr. 126-27, Jun. 12, 2013.)  Defendant Wilson placed something in the back seat of the vehicle and one of the Defendants placed a white bag in the trunk.  (Hr'g Tr. 127, Jun. 12, 2013.)   Defendant Raymond was in the passenger seat and Defendant Wilson was driving.  (Hr'g Tr. 128-29, Jun. 12, 2013.)   Reed did not observe any males approach the car.  (Hr'g Tr. 129, Jun. 12, 2013.)

Reed followed the red Mazda for approximately two miles until Detective Smith fell in behind the red Mazda.  (Hr'g Tr. 37, 130, Jun. 12, 2013.)   Detective Smith was driving an unmarked patrol vehicle that was equipped with blue lights. (Hr'g Tr. 39, Jun. 12, 2013.)  Shortly thereafter, Detective Smith observed the red Mazda go left of center.  (Hr'g Tr. 37, Jun. 12, 2013.)  The red Mazda then went left of center two more times.  (Hr'g Tr. 37-38, Jun. 12, 2013.)   When Detective Smith reached a safe place in the road to pull over the red Mazda, he turned on his

blue lights and initiated a traffic stop. (Hr'g Tr. 39, Jun. 12, 2013.) Once the red

Mazda came to a stop, Officer Velez pulled his vehicle in front of Detective

Smith's vehicle, and the two officers approached the red Mazda. (Hr'g Tr. 40,

173-74, Jun. 12, 2013.)

Officer Velez approached the driver's side and Detective Smith approached

the passenger side of the red Mazda. (Hr'g Tr. 40, 174, Jun. 12, 2013.) Officer

Velez did not have his citation book with him at the time. (Hr'g Tr. 198, Jun. 12,

2013.) When the two officers approached, Detective Smith observed both

Defendants typing on their phones, and he asked the Defendants to please refrain

from typing, texting, or making calls on the phone. (Hr'g Tr. 40, Jun. 12, 2013.)

Both Defendants complied, although Defendant Wilson shut the phone a little

harder than normal. (Hr'g Tr. 40, 78, Jun. 12, 2013.) Detective Smith explained to

Defendant Wilson, who was driving the vehicle, that she was being pulled over for

crossing the double yellow line on more than one occasion. (Hr'g Tr. 41, 76, 198,

Jun. 12, 2013.) While the officers were talking to Defendants, Defendant Wilson

kept her hands where Detective Smith could see them, did not reach between the

seat or the console, did not make any aggressive movements, and was not acting

scared or nervous. (Hr'g Tr. 78-9, Jun. 12, 2013.) Detective Smith had no

concerns that Defendant Wilson was driving while impaired. (Hr'g Tr. 80, 108, Jun. 12, 2013.)

Officer Velez asked Defendant Wilson for her driver's license and registration, as well as whatever information she had in the vehicle. (Hr'g Tr. 175, 200, Jun. 12, 2013.) Defendant Wilson provided Officer Velez with her driver's license and a copy of the rental agreement for the vehicle. (Hr'g Tr. 175, Jun. 12, 2013.) Detective Smith asked Defendant Raymond for her license and she handed it to Officer Velez. (Hr'g Tr. 106-08, 180, Jun. 12, 2013.) Officer Velez then returned to his patrol car and radioed in the license plate number and driver's license. (Hr'g Tr. 41, 175, 201, Jun. 12, 2013.) Detective Smith remained at the passenger side door of the vehicle watching the Defendants. (Hr.'g Tr. 81, Jun. 12, 2013.)

As Officer Velez and Detective Smith were talking to Defendants, other officers arrived on the scene. (Hr'g Tr. 77, Jun. 12, 2013.) Officer Cox arrived on the scene with Beck shortly after Detective Smith initiated the traffic stop. (Hr.'g Tr. 127-28, Jun. 20, 2013.) After assessing the scene, Officer Cox gave Beck the command to sniff the exterior of the red Mazda. (Hr'g Tr. 127-28, Jun. 20, 2013.) The officers did not inform Defendants about the dog search prior to its occurrence. (Hr'g Tr. 83-84, Jun. 12, 2013.) At the time, there were at least four

armed law enforcement officers on the scene.  (Hr'g Tr. 162-63, Jun. 20, 2013.)

Beck began sniffing the exterior of the red Mazda approximately two minutes after it came to a stop.  (Gov. Ex. 4a.)   When Beck began his sniff, Officer Velez was back at his patrol car running the tag and license information (Gov. Ex. 4a; Hr'g Tr. 175, Jun. 12, 2013), and Detective Smith was standing approximately three feet from the passenger door of the red Mazda (Hr'g Tr. 82, Jun. 12, 2013; Hr'g Tr. 128, 137, Jun. 20, 2013; Gov. Ex. 4a).   Officer Cox ordinarily does not want other individuals standing close to the vehicle when he conducts a dog-sniff with Beck because it could hinder the sniff.  (Hr'g Tr. 141-42, Jun. 20, 2013.)  Officer Cox, however, did not ask Detective Smith to move away from the red Mazda prior to conducting the sniff.  (Hr'g Tr. 142, Jun. 20, 2013; Gov. Ex. 4a.)

Beck began by sniffing the rear of the car and then working his way around the passenger side of the red Mazda.  (Hr'g Tr. 132, Jun. 20, 2013.)  After turning the corner, Beck moved towards Detective Smith and placed his head down in the area where Detective Smith's feet were located.  (Hr'g Tr. 137, 145. Jun. 20, 2013.)  Beck appeared to sniff at the feet of Detective Smith.  (Hr'g Tr. 147-48, 179, Jun. 20, 2013.)   Beck also displayed changes in his behavior when he moved to Detective Smith.  (Hr'g Tr. 148, 152, Jun. 20, 2013.)  Beck lowered his head,

changed his gait, and appeared to sniff at Detective Smith's feet. (Hr'g Tr. 147-49, Jun. 20, 2013; Hr.Tr. 86, Jun. 12, 2013; Gov.'s Ex. 4a.) Officer Cox then redirected Beck to the red Mazda and gave him a "nay" command. (Hr'g Tr. 137, 152, Jun. 20, 2013.) Beck then completed the sniff around the exterior of the red Mazda. (Gov.'s Ex. 4a.) The entire sniff takes less than thirty seconds, and Officer Cox only takes Beck around the red Mazda once. (Gov. Ex. 4a; Hr'g Tr. 167, Jun. 20, 2013; Hr'g Tr. 85, Jun. 12, 2013.) It is undisputed that Beck did not give his trained indication; he did not sit and stare. (Hr'g Tr. 148, 173, Jun. 20, 2013.)

Officer Cox, however, informed Detective Smith that Beck alerted to the passenger side door. (Hr'g Tr. 156-57, Jun. 20, 2013; Hr'g Tr. 90, 111, Jun. 12. 2013.) Officer Cox testified that he determined that Beck alerted based on the changed behavior he observed while Beck was in the vicinity of the passenger side door, particularly Beck's change in breathing. (Hr.'g Tr. 161, 165, Jun. 20, 2013.) In fact, Officer Cox testified that the only difference in behavior that he observed from when Beck appeared to sniff Detective Smith's feet and when he supposedly alerted to the passenger door was that he observed a change in breathing. (Hr'g Tr. 161, 168, 179, 181-82, Jun. 20, 2013.) Although it would have taken Officer Cox less than a minute to work Beck back around the red Mazda and give Beck a

chance to further investigate the passenger side door and potentially give a final indication, Officer Cox decided not to take Beck around the vehicle a second time. (Hr.'g Tr. 167-68, Jun. 20, 2013.)

Meanwhile, upon seeing the dog, Defendant Raymond appeared a little more agitated and asked why the dog was there. (Hr'g Tr. 84-85, Jun. 12, 2013.) Neither Officer Cox nor Detective Smith responded. (Hr'g Tr. 84-85, Jun. 12, 2013.) At some point while Beck is circling the red Mazda, Defendant Wilson reaches down and picks up her phone. (Hr'g Tr. 87, Jun. 12, 2013.) As Defendant Wilson was holding the flip phone open in her hand, Detective Smith asked her to refrain from using her phone. (Hr'g Tr. 87, Jun. 12, 2013.) Defendant Wilson then broke the flip phone in half. (Hr'g Tr. 88, Jun. 12, 2013.)

Prior to this point Defendant Wilson was not acting nervous, angry, or upset. (Hr'g Tr. 87, Jun. 12, 2013.) Defendant Wilson was not doing anything else that raised any concern for Detective Smith; she kept her hands where Detective Smith could see them, she was not sweating heavily, was not using the phone in a threatening manner, and was not acting suspicious. (Hr'g Tr. 87-90, Jun. 12, 2013.) Around this same time, Officer Cox informed Detective Smith that the dog alerted to the presence of narcotics. (Hr'g Tr. 89-90, Jun. 12, 2013.) Detective Smith then testified that he asked the Defendants to step out of the car

because Defendant Wilson broke the phone. (Hr'g Tr. 115-16, 134, Jun. 12, 2013.)

Defendants complied with Detective Smith's instruction and exited the vehicle.

(Hr'g Tr. 90, Jun. 12, 2013.) Detective Smith did not observe anything about the

way the Defendants exited the vehicle that raised any concerns. (Hr'g Tr. 90, Jun.

12, 2013.) From the time he approached the red Mazda until the time he ordered

the Defendants out of the vehicle, Detective Smith did not suspect that Defendants

were armed. (Hr'g Tr. 113, Jun. 12, 2013.)

After exiting the red Mazda, Defendant Wilson was taken to the front of

Officer Velez's vehicle by Officer Reed and Defendant Raymond was escorted to

the rear of the vehicle. (Hr'g Tr. 91, 134, Jun. 12, 2013.) Neither Defendant was

placed in handcuffs at the time. (Hr'g Tr. 113, Jun. 12, 2013.) Officer Reed asked

Defendant Wilson to face Officer Velez's vehicle and place her hands on the

vehicle's push bar. (Hr'g Tr. 134-35, Jun. 12, 2013.) At the time, Officer Reed did

not observe Defendant Wilson do anything that raised any safety concern. (Hr'g

Tr. 136, Jun. 12, 2013.)

Approximately two minutes after Defendant Wilson was removed from the

red Mazda, dispatch informed Officer Velez that Defendant Wilson's license was

valid and she did not have any outstanding warrants for her arrest. (Gov.'s Ex. 4a;

Hr'g Tr. 201, Jun 12, 2013.) At this point, Detective Smith then began to search

the red Mazda. (Gov.'s Ex. 4a; Hr'g Tr. 91, Jun. 12, 2013.) Detective Smith did

not ask for permission to search the red Mazda. (Hr'g Tr. 118, Jun. 12, 2013.)

Approximately a minute after dispatch relayed the information regarding

Defendant Wilson, dispatch informed Officer Velez that Defendant Raymond, who

was the passenger in the vehicles, had an invalid license and no outstanding

warrants for her arrest. (Gov.'s Ex. 4a; Hr'g Tr. 201-02, 229, Jun. 12, 2013.) At

this point, Defendants were not released, were not issued a citation, and their

driver's licenses were not returned. (Gov.'s Ex. 4a; Hr'g Tr. 214, 233, 239, Jun.

12, 2013.) Neither Defendant was acting violent or aggressive, nor was Officer

Velez concerned that Defendant Wilson had a firearm on her person. ( Hr'g Tr.

206-07, 229-30, 236, Jun. 12, 2013 .) Ultimately, the search of the vehicle did not

reveal any narcotics. (Hr'g Tr. 116, Jun. 12, 2013.) The officers found a bag of

garbage in the trunk and some personal belongings in the back seat. (Hr.'g Tr.

116, 138-39, Jun. 12, 2013.)

At some point after the Defendants were removed from the red Mazda,

Detective Shiver arrived on the scene. (Hr'g Tr. 241, Jun. 20, 2013.) Once he

arrived at the traffic stop, Detective Shiver approached Defendant Raymond, who

was standing at the back of Officer Velez's vehicle at the time. (Hr'g Tr. 241, Jun.

20, 2013.) Detective Shiver testified that he observed Defendant Raymond

touching and rubbing her stomach and moving her dress around.  (Hr'g Tr. 241, Jun. 20, 2013.)  He also testified that he observed something protruding from Defendant Raymond's groin area.  (Hr'g Tr. 242, Jun. 20, 2013.)   Detective Shiver, however, did not pat down Defendant Raymond and did not ask anyone to pat her down at the time.  (Hr'g Tr. 242, Jun. 20, 2013.)

Meanwhile, Officer Velez contacted Officer Neadeau, and requested that she come to the scene to perform a <u>Terry</u> frisk of the Defendants for officer safety.  (Hr'g Tr. 243, Jun. 12, 2013.)  When she arrived on the scene, Officer Neadeau approached Detective Smith, who informed her that Beck had alerted to the vehicle and he wanted her to perform a <u>Terry</u> frisk for officer safety.  (Hr'g Tr. 244-45, Jun. 12, 2013.)  By the time Officer Neadeau arrived, there were at least seven officers on the scene and at least one other drove by during the stop.  (Hr'g Tr. 104-05, Jun. 12, 2013.)  Four or five police vehicles were also on the scene with at least two flashing their blue lights.  (Hr'g Tr. 105, 140, Jun. 12, 2013.)   Officer Neadeau had no reasonable suspicion that either Defendant was armed at the time.  (Hr'g Tr. 280-281, Jun. 12, 2013.)

When Neadeau arrived, the Defendants had already been removed from the car and placed on opposite sides of Officer Velez's vehicle.  (Hr'g Tr. 245, Jun. 12, 2013.)   Officer Neadeau first conducted a pat down of Defendant Raymond, where

she felt a soft, bulge in the front groin area. (Hr'g Tr. 246-47, Jun. 12, 2013.)

Officer Neadeau then attempted to conduct a pat down of Defendant Wilson.

(Hr'g Tr. 253, Jun. 12, 2013.)  The pat down of Defendant Wilson occurred

approximately fifteen to sixteen minutes after the traffic stop was initiated.

(Gov.'s Ex. 4a.)  Defendant Wilson, however, refused to spread her legs and

comply with her request, and Defendant Neadeau was unable to successfully

complete a search of Defendant Wilson at the time.  (Hr'g Tr. 253, Jun. 12, 2013.)

Defendant Wilson then returned to the front of Officer Velez's vehicle.  (Gov.'s

Ex. 4a.)

After Officer Neadeau informed Detective Shiver about the bulge, Detective

Shiver and Officer Neadeau approached Defendant Raymond; Detective Shiver

informed her about the dog alert and that they were investigating the sale of

Oxycodone.  (Hr'g Tr. 245, Jun. 20, 2013.)  At this point, Defendant Raymond told

the two officers that she had a prescription for Oxycodone.  (Hr'g Tr. 245; Hr'g Tr.

254, Jun. 12, 2013.)   Detective Shiver then told Defendant Raymond that he

believed she had pills hidden in the bulge under her clothes and to let Officer

Neadeau have the pills because if she had a prescription then there is nothing

wrong about possessing the Oxycodone.  (Hr'g Tr. 245-47, Jun. 20, 2013.)

At this point, Officer Neadeau took Defendant Raymond to Officer

Neadeau's patrol car, where Defendant Raymond proceeded to reach under her dress and pull out a plastic baggy wrapped in a sock and toilet paper. (Hr'g Tr. 255, Jun. 12, 2013.) Officer Neadeau then turned the bag over to Detective Shiver. (Hr.'r Tr. 247, Jun. 12, 2013.) The bag contained fifty 30 milligram Oxycodone tablets and fourteen or fifteen 2 milligram Alprazolam tablets. (Hr'g Tr. 248, Jun. 20, 2013.)

Detective Shiver then told Officer Velez to place Defendant Wilson in handcuffs, place her in the back of his patrol car, and transport her to the Cherokee Indian Police Department. (Hr'g Tr. 249, Jun. 20, 2013, Hr'g Tr. 183-85, Jun. 12, 2013.) Detective Shiver told Officer Neadeau to detain Defendant Raymond and take her to the Cherokee Indian Police Department. (Hr.' Tr. 255-56. Jun. 12, 2013.) Officer Neadeau then placed Defendant Raymond in handcuffs and put her in the back of her patrol vehicle. (Hr'g Tr. 256, Jun. 12, 2013.) Officers Neadeau and Velez then separately transported the Defendants to the Cherokee Indian Police Department. (Hr'g Tr. 185, 256, Jun. 12, 2013.) Once at the police department, Officer Neadeau tried to search Defendant Wilson, but Defendant Wilson again failed to comply, and Officer Neadeau was unable to search Defendant Wilson at that time. (Hr'g Tr. 258, 269, Jun. 12, 2013.) The officers then placed Defendants in holding cells. (Hr'g Tr. 185-86, 258, Jun. 12, 2013;

Hr'g Tr. 251, Jun. 20, 2013.) Several hours later, officers transported the Defendants to the Swain County jail, where they were turned over to jail personnel. (Hr'g Tr. 192, 209-10, Jun. 12, 2013; Hr'g Tr. 252, Jun. 20, 2013.)

At the Swain County jail, jail personnel performed strip searches of both Defendants because they were told to do so by Reed. (Hr'g Tr. 5-8, 21-23, 27 Jun. 20, 2013.) Jail personnel did not find anything on Defendant Raymond during the strip search. (Hr'g Tr. 5, Jun. 20, 2013.) Jail personnel found a plastic bag with pills on Defendant Wilson. (Hr'g Tr. 9-10, Jun. 20, 2013.)

## C.     The Search of the Apartment

On October 11, 2012, Sergeant McCoy with the Jackson County Sheriff's Office prepared an application for a search warrant for the Maple Ridge Apartments, which is located in Jackson County. (Hr.'g Tr. 31-32, Jun. 20, 2013.) Specifically, the search warrant was for Apartment 10 at the Maple Ridge Apartments at 2348 U.S. 441 North, Whittier, North Carolina, 28789. (Hr'g Tr. 32, Jun. 20, 2013.) As part of the investigation to confirm the information in the search warrant, Sergeant McCoy contacted the apartment manager. (Hr'g Tr. 32-22, Jun. 20, 2013.) The apartment manager told Sergeant McCoy that Eddie Delly rented the apartment, but that Defendant Raymond made the monthly payments. (Hr'g Tr. 33, Jun. 20, 2013.)

After he prepared the application for a search warrant, he took the warrant to North Carolina Superior Court Judge Bradley Letts at his personal residence. (Hr'g Tr. 34, 43, Jun. 20, 2013.)  Detective Smith accompanied Sergeant McCoy in case Judge Letts had any questions.  (Hr'g Tr. 34, 42, Jun. 20, 2013.)  Judge Letts had both officers swear on the Bible that the contents of the application for a search warrant and what they told him were truthful.  (Hr'g Tr. 43, Jun. 20, 2013.) Judge Letts then asked Detective Smith to give him an overview of the search warrant while Judge Letts read the search warrant.  (Hr'g Tr. 42, Jun. 20, 2013.) Detective Smith spoke for two or three minutes, primarily about the stop of the red Mazda in which Defendants were traveling.  (Hr'g Tr. 43-44, Jun. 20, 2013.) Judge Letts then signed the warrant.  (Hr'g Tr. 43, 45, Jun. 20, 2013.)

After Judge Letts signed the search warrant, a tactical team breached the apartment door and officers conducted a search of the apartment.  (Hr'g Tr. 34-35, Jun. 20, 2013.) During the search of the apartment, officers seized thousands of pills, among other items.  (Gov.'s Ex. 3; Hr'g Tr. 36, Jun. 20, 2013.)

## II.    Discussion

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place

to be searched and the persons or things to be seized.

U.S. Const. amend 4.  Pursuant to the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."  <u>United States v. Calandra</u>, 414 U.S. 338, 347, 94 S. Ct. 613, 619 (1974).

The temporary detention of an individual by a police officer during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment.  <u>United States v. Vaughan</u>, 700 F.3d 705, 709 (4th Cir. 2012); <u>United States v. Digiovanni</u>, 650 F.3d 498, 506 (4th Cir. 2011).  The decision to initiate a stop of an automobile is reasonable if the police officer has probable cause to believe that a traffic violation has occurred.  <u>Digiovanni</u>, 650 F.3d at 506.  "Any ulterior motive a police officer may have for making the traffic stop is irrelevant."  <u>Id.</u>

Courts employ the standard set forth by the United States Supreme Court in <u>Terry v. Ohio</u>, 292 U.S. 1, 88 S. Ct. 1868 (1968), to determine whether police conduct during routine traffic stops comports with the requirements of the Fourth Amendment.  <u>Vaughan</u>, 700 F.3d at 709; <u>United States v. Guijon-Ortiz</u>, 660 F.3d 757, 764 (4th Cir. 2011).   As the United States Court of Appeals for the Fourth Circuit explained in <u>Guijon-Ortiz</u>:

> Under *Terry's* "dual inquiry," after asking whether the officer's action was "justified at its inception," *Rusher*, 966 F.2d at 875, we ask

whether the continued stop was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). With regard to scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* With regard to duration, although the reasonable duration of a traffic stop "cannot be stated with mathematical precision," *United States v. Branch*, 537 F.3d 328, 336 (4th Cir.2008), a stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L.Ed.2d 842 (2005). Thus, we evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L.Ed.2d 605 (1985). To prolong a traffic stop "beyond the scope of a routine traffic stop," an officer "must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." *Branch*, 537 F.3d at 336. This requires "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *Id.*

Although the scope and duration components of *Terry's* second prong require highly fact-specific inquiries, the cases make possible some generalizations. When a police officer lawfully detains a vehicle, "police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket." *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir.2011). The officer may also, "in the interest of personal safety," request that the passengers in the vehicle provide identification, at least so long as the request does not prolong the seizure. *United States v. Soriano–Jarquin*, 492 F.3d 495, 500–01 (4th Cir. 2007). Similarly, the officer may "inquir[e] into matters unrelated to the justification for the traffic stop," *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L.Ed.2d 694 (2009), and may take other actions that do not constitute "searches" within the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle, *Caballes*, 543 U.S. at 409, 125 S. Ct. 834, but again only "so long as those inquiries [or other actions]

do not measurably extend the duration of the stop." *Johnson*, 129 S. Ct. at 788.

660 F.3d at 764-65.

Here, there is no question that the initial stop of the red Mazda was reasonable because Officer Smith had probable cause to believe that Defendant Wilson committed a traffic violation by going left of center on three occasions. The fact that Officer Smith may have had other motives for stopping the red Mazda is irrelevant. See Digiovanni, 650 F.3d at 506. Accordingly, the question for the Court is whether the actions taken by the officers after the initial stop complied with the requirements of the Fourth Amendment.

The traffic stop began when Detective Smith and Officer Velez pulled over the red Mazda. See id. Detective Smith and Officer Velez requested identification from the driver and the passenger, as well as the car's registration. Officer Velez then promptly returned to his patrol car to run a computer check on the vehicle, check the licenses of Defendants, and check for outstanding arrest warrants on both Defendants, as he was entitled to do as part of a traffic stop. See Vaughan, 700 F.3d at 710; United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007); see also United States v. Ramos, 20 F.3d 348, 353 (8th Cir. 1994). Detective Smith was also entitled to order both Defendants to exit the vehicle, as he did approximately three minutes into the stop. Vaughan, 700 F.3d at 710. When

Defendants exited the vehicles, however, Detective Smith did not notice anything suspicious about Defendants. Moreover, the initial dog-sniff of the vehicle that lasted under thirty seconds and occurred approximately two minutes into the stop while Officer Velez was having dispatch check for outstanding warrants on Defendants did not run afoul of the Fourth Amendment as it did not extend the duration of the stop.  See id.  Once Defendants exited the vehicle and the dog completes the sniff of the red Mazda, however, the analysis becomes more complicated.

Approximately five minutes into the stop, the computer check of Defendant is complete, dispatch has confirmed that neither Defendant has outstanding warrants and Defendant Wilson has a valid driver's license, and the officers did not suspect that Defendant Wilson was driving under the influence.  At this point, the officers had not conducted a pat down of Defendants and no narcotics had been discovered.  Moreover, the officers were not questioning Defendants at the time. Ordinarily, the officer would then write a ticket or issue a warning and the stop would end.   In fact, Officer Velez – one of the two officers who initiated the traffic stop – testified that once he had completed a check of the Defendants' information, he did not see a reason to continue to detain Defendants.   (Hr'g Tr. 239, Jun. 12, 2013.)

The officers in this case, however, did not return Defendants' licenses after the completion of the computer check, did not write Defendant Wilson a ticket, and did not allow Defendants to leave the scene because Officer Cox told Detective Smith that Beck alerted to the presence of narcotics at the passenger side door. Instead, the officers began searching the entire vehicle for narcotics. Once Officer Cox told Detective Smith that the dog alerted and Detective Smith began searching the red Mazda for narcotics, the nature of the stop changed from one investigating the reason behind the initial stop – left of center – to an investigation into drug trafficking activity. Put another way, the officers abandoned the prosecution of the traffic stop, detained Defendants, and embarked on another sustained course of investigation.

Once the officers detained Defendants beyond the scope of the routine traffic stop for left of center, the officers needed either the permission of Defendant Wilson or reasonable suspicion of illegal activity to prolong the stop. Digiovanni, 650 F.3d at 507; United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008); United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004). The reasonable suspicion standard is not as demanding as the probable cause standard and requires a showing that is considerably less than preponderance of the evidence. Foreman, 369 F.3d at 781. "However, the *Terry* reasonable suspicion standard does require a

minimal level of objective justification for the police action." Id. (internal

quotation and citation omitted). Reasonable suspicion is an objective test, and

Courts look to the totality of the circumstances to determine whether the detaining

officer had a "particularized and objective basis for suspecting legal wrongdoing."

Vaughan, 700 F.3d at 710 (internal citation and quotation omitted).

> A reasonable suspicion is demonstrated when an officer is able to "point to 'specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity.' " United States v. Branch, 537 F.3d 328, 336 (4th Cir.2008) (quoting Terry, 392 U.S. at 27, 88 S.Ct. 1868) (internal citations omitted). When an officer has reasonable suspicion of criminal activity, he may detain the suspect so as "to permit the officer to allay the suspicion." Mason, 628 F.3d at 128.

United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012).

Here, the officers point to the statement by Officer Cox that Beck alerted to

the presence of narcotics on the passenger side door as reasonable suspicion of

illegal activity. The positive alert from a dog trained to detect narcotics provides

officers with reasonable suspicion to believe that narcotics are present and, thus,

that illegal activity is afoot. See United States v. Mason, 628 F.3d 123, 130 (4th

Cir. 2010); Branch, 537 F.3d at 340, n.2.[1,2] Defendants, however, challenge the

---

1   The Court notes that the issue in this case is whether the officers had reasonable suspicion of illegal activity to detain Defendants beyond what was reasonable for a routine traffic stop, not whether the search itself was unlawful. Because Defendants did not have permission of Hertz, the owner of the red Mazda, to drive the vehicle, Defendants had no legitimate privacy interest in the rental car.   United States v. Wellons, 32 F.3d 117, 119 (4th Cir. 1994);

validity of the positive alert in this case.[3]

Whether a dog alerts is a question of fact for this Court to resolve. <u>Mason</u>, 628 F.3d at 130; <u>see</u> <u>also</u> <u>United States v. Curry</u>, 478 F. App'x 42, 43-44 (4th Cir. 2012) (unpublished); <u>United States v. Christian</u>, 452 F. App'x 283, 286 (4th Cir. 2011) (unpublished). A determination of whether a dog alerts will ordinarily turn on the credibility of the dog handler, as the handler is the individual trained to recognize the changes of behavior of a dog that should constitute an alert to the presence of contraband. <u>Christian</u>, 452 F. App'x at 286; <u>see</u> <u>also</u> <u>Curry</u>, 478 F. App'x at 44. As the United States Court of Appeals for the Sixth Circuit explained in <u>United States v. Howard</u>, 621 F.3d 433, 449 (6th Cir. 2010):

> Rather, as recognized by the district court, "the primary issue in determining the credibility of a dog's alert is not the capability or ability of a dog to accurately identify particular scents, but is instead the communication between the handler and the dog based on that indisputable ability." <u>Howard</u>, 448 F.Supp.2d at 897–98. This determination in turn rests almost entirely on the credibility of the dog handler's testimony "[b]ecause the handler is the only witness who can speak to the subjective interaction during a particular dog alert." <u>Id.</u> at 900.

---

United States v. Mincey, 321 F. App'x 233, 239-40 (4th Cir. 2008) (unpublished). The search of the red Mazda, however, revealed no narcotics, and Defendants are not moving to suppress the actual search of the vehicle.

2  Although <u>Mason</u> and <u>Branch</u> address probable cause to search vehicles for narcotics without a warrant, the legal reasoning is applicable to this case. If a dog alert provides probable cause to search a vehicle for narcotics without a warrant, then the alert would also provide reasonable suspicion of illegal activity since the standard for reasonable suspicion is a lesser one than probable cause. <u>See</u> <u>Foreman</u>, 369 F.3d at 781.

3  Defendants do not challenge Beck's general reliability, only the reliability of this particular alert. Based on the evidence submitted to the Court during the evidentiary hearing, and after considering the standard set forth by the United States Supreme Court in <u>Florida v. Harris</u>, 133 S. Ct. 1050 (2013), the Court finds that Beck is generally reliable, and that ordinarily an alert from Beck would provide probable cause to search a vehicle or reasonable suspicion to detain the drivers to alleviate concern of illegal activity.

It is undisputed that Beck did not give his trained indication in this case; Beck did not sit and stare. Instead, Officer Cox testified that he was able to discern that Beck alerted based on Beck's changed behavior at the passenger side door. As a threshold matter, to the extent that Defendants ask this Court to adopt a standard requiring that a dog demonstrate its trained response or final alert – sitting and staring in this case – in order to constitute an alert that would provide probable cause to search a vehicle or reasonable suspicion of illegal activity sufficient to detain Defendants, the Court declines to do so. See United States v. Parada, 577 F.3d 1275, 1281-82 (10th Cir. 2009) (Thus, the general rule we have followed is that a dog's alert to the presence of contraband is sufficient to provide probable cause. We decline to adopt the stricter rule urged by [defendant], which would require the dog to give a final indication before probable cause is established."); but see United States v. Rivas, 157 F.3d 364, 368 (5th Cir. 1998) (holding that the Government did not meet its burden of demonstrating that casting should always be deemed equivalent to an alert). As Defendants' expert testified, the purpose of the trained response is for the dog to get as close as possible to the point of the odor's origin and then give its trained response. A dog, however, will show interest in an area and alert to the presence of narcotics prior to giving its trained response. Adopting such an inflexible standard that required a final response in

every case would not take into account the varied and dynamic circumstances that police officers often face when conducting a dog-sniff of a vehicle. As the Tenth Circuit pointed out in Parada:

> Indeed, it might be dangerous to permit a narcotics dog to pinpoint the location of the drugs in certain circumstances, such as here, where the vehicle's occupants were still inside and the dog was trained to indicate by barking, scratching, and biting at the source of the odor.

577 F.3d at 1282. Accordingly, the Court finds that the fact that Beck did not give his trained response does not, as a matter of law, render the alert invalid.

The Court, however, finds that after a review of the evidence in the record and after witnessing the testimony of the witnesses, that Beck did not in fact alert to the presence of narcotics in this case. In short, the Court finds the testimony of Officer Cox that Beck alerted to the passenger side door not to be credible. An examination of the video of the traffic stop shows that within five or six seconds of Officer Cox beginning the dog-sniff of the red Mazda, Beck veered off the search pattern and headed towards Detective Smith. As Beck heads towards Detective Smith, the change in his behavior is apparent; Beck lowers his head, appears to change his gait, and begins to sniff either Detective Smith's shoes or the ground around his shoes. It is clear from the video that Beck shows an interest in either Detective Smith or the area around him that would be consistent with the type of alert that might precede a final indication. Officer Cox, however, redirects Beck

away from Detective Smith and restarts the sniff of the perimeter of the vehicle. Aside from investigating Detective Smith, Beck maintains a constant speed around the vehicle and does not stop to investigate any particular area of the car more than others. Moreover, there is no noticeable change in behavior in the video when Beck is at the passenger door.

Although Officer Cox testified that Beck changed his gait, put his head down, and began breathing heavy when he was at the passenger door, the Court does not find this testimony to be credible. The Court also finds his testimony that Beck did not have a change in breathing when sniffing Detective Smith but did have a noticeable change of breathing at the passenger side door is not credible. The Court finds that Officer Cox's testimony when asked about Beck investigating Detective Smith's feet was evasive and not credible and that his testimony about why he did not bring Beck back around the car or ask Detective Smith to move away from the car prior to restarting the search is not credible.

It took Officer Cox less than thirty seconds to take Beck around the car, including the time it took him to re-direct Beck from Detective Smith. Despite the fact that Officer Cox testified that Beck demonstrated all the changes in behavior that might indicate an alert other than a noticeable change in breathing while Beck sniffs Detective Smith, Officer Cox does not ask Detective Smith to step back from

the red Mazda, does not take Beck around the car a second time, and does not let Beck investigate the passenger door further to see if he would give his trained response. Despite testifying that he normally would have taken these steps, he did not do so in this case because he "did not want to hinder Officer Smith with his, you know, traffic stop" and because he had some nebulous concern about guys with guns. (Hr'g Tr. 161-62, Jun. 20, 2013.)

At the point when Officer Cox conducted the dog sniff of the red Mazda, however, it was midday and there were at least four armed police officers and three or four police vehicles on the scene. Defendants were cooperative at the time and even Detective Smith testified that he did not believe that Defendants were armed. Moreover, the red Mazda had only been stopped for approximately two minutes when Officer Cox conducted the dog-sniff. The suggestion by Officer Cox that he did not take another thirty seconds to one minute to attempt to illicit a trained response in this case because of some concern for officer safety is simply not credible. As the expert witness testified, Officer Cox should have directed Detective Smith to move away from the red Mazda before he directed Beck to begin his sniff and should have brought Beck around the red Mazda for a second time. In contrast to the one year of experience as a dog handler Officer Cox had at the time of the traffic stop, the expert witness has been training dogs for twenty-

five years and drug detection dogs for nineteen years.  (Hr.'g Tr. 78, 296-98, Jun. 20, 2013.)

The failure of Officer Cox to let Beck examine the passenger door again is all the more troubling in light of the fact that Detective Smith was standing approximately three feet away from the passenger door at the time and Beck shows an interest in either Detective Smith's feet or the area where he is standing that would be consistent with an alert.  Having viewed the witness and heard the testimony of all the witnesses, reviewed the documentary evidence, and reviewed the video of the dog-sniff countless times,  the Court finds Officer Cox's testimony that Beck alerted to the presence of narcotics at the passenger door not to be credible.   The Court also finds the testimony of the expert witness, Officer Blackwell, to be more credible and persuasive than the testimony of Officer Cox. There is no legitimate reason in this case for not taking Beck back around the red Mazda and allowing Beck at least an opportunity to give his final indication and an opportunity to examine the passenger door without Detective Smith standing in the immediate vicinity of the vehicle.  Finally, the only credible testimony on the record before the Court is that Beck was not even trained to detect Oxycodone and would not have alerted to the pills that the Defendants were concealing on their person.

Having found that Beck did not alert in this case, the Government cannot rely on the alert to constitute reasonable suspicion of criminal activity to warrant detaining Defendants beyond what was necessary to complete the traffic stop. And absent the dog alert, there is not reasonable suspicion of criminal activity prior to the time when the traffic stop should have ended.  The officers did not question Defendants about where they were going, did not ask who had rented the red Mazda, did not ask if they had permission of the named driver to drive the vehicle, and did not ask if drugs were in the car.  Moreover, the officers testified that Defendants were cooperative, were not sweating heavily, and were not acting suspicious, threatening, or aggressive.  In fact, aside from asking for Defendants' identification, the officers did not ask Defendants <u>any</u> questions until shortly before they began searching their persons.   Aside from some of the general information from informants that led to the initial surveillance of the red Mazda, the officers had virtually no reason aside from the purported alert by Beck to justify prolonging the stop, a fact that even one of the two officers who initiated the stop recognized.  The purported alert by Beck is the lynchpin and once it is removed, there is no justification for the subsequent actions taken by the officers.

In contrast to the Government's contention to the contrary, the fact that Defendant Wilson broke her own phone when Detective Smith told her to refrain

from using the phone did not provide reasonable suspicion of criminal activity.[4] At most, Defendant Wilson became agitated when Detective Smith told her for the second time to refrain from using the phone and she snapped her flip phone in half. Defendant Wilson was neither using the phone in a threatening manner nor exhibiting any other suspicious behavior. After she breaks the phone, Detective Smith does not inquire as to why she broke the phone or asks her any questions regarding the phone.

Finally, the fact that Defendants were traveling in a rental vehicle does not dictate a different results. The officers knew prior to the stop that the red Mazda was a Hertz rental car rented by David Delly. Hertz had also already informed the officers that Defendant Wilson was not an authorized driver of the vehicle and requested that the officers not release the car to Defendant Wilson. Thus, no additional time was needed for the officers on the scene to contact Hertz during the stop and determine whether Defendant Wilson was an authorized driver. See e.g. United States v. Mincey, 321 F. App'x 233, 241-42 (4th Cir. 2008) (unpublished). Although the officers could have impounded the car at that point, they did not have grounds to further detain Defendants.[5]

---

4  Although not dispositive of any issue in the case, the Court finds that Detective Smith's testimony that he ordered Defendants out of the car because Defendant Wilson broke her phone, as opposed to the fact that Officer Cox had just told him that Beck had alerted to the presence of narcotics on the passenger side door not to be credible.
5  The Government's reliance on N.C. Gen. Stat. 14-72.2(a), which makes it unlawful to operate a motor vehicle

After being pulled over, Defendant Wilson provided Officer Verez with the rental agreement showing that David Delly had rented the vehicle. None of the officers asked Defendant Wilson if she had proof of authorization to possess or operate the vehicle or why the rental agreement was in someone else's name. Although the officers could have extended the traffic stop in order to ask Defendants questions regarding the rental agreement, the identity of Delly, why Delly was letting them use the car, whether Delly had given them permission to operate the vehicle, whether they had written authorization to operate the vehicle, where Delly was at the time, or any number of questions related to the rental vehicle, they did not do so. See e.g. United States v. Martin, 422 F.3d 597, 602 (7th Cir. 2005). In fact, the answers to these questions combined with the fact they were driving a rental car without authorization could have even provided reasonable suspicion to further detain Defendants in order to alleviate any concerns that Defendants were trafficking narcotics. The officers, however, did not ask Defendants any questions until well into the stop, and never inquired into the rental car or the rental agreement. Instead, the officers detained Defendants based almost

without the express or implied consent of the owner or person in lawful possession of the vehicle, is misplaced as the officers had no indication that Defendant Wilson was operating the red Mazda without the consent of Delly, the person in lawful possession of the vehicle. Although the operation of the vehicle may have constituted a breach of the rental agreement between Delly and Hertz, and may have provided Hertz with the ability to request that the officers not turn the vehicle back over to Defendants, the officers did not have reasonable suspicion that the Defendants were operating the rental car in violation of North Carolina law. None of the officers inquired as to whether Defendant Wilson had the authorization of Delly to operate the vehicle. If anything, the officers knew that Delly had intentionally provided Defendant Wilson with the rental vehicle for her use. In addition, there was no testimony that the officers believed that the red Mazda was stolen.

entirely on the dog alert that the Court finds did not occur.  Based on the totality of circumstances, the Court finds that the Government has failed to demonstrate a reasonable suspicion to detain Defendants beyond the scope necessary to effectuate the traffic stop for left of center.

## B.    The <u>Terry</u> Frisk

An officer engaged in a traffic stop may conduct a pat-down for weapons of the driver or passenger where the officer has the reasonable suspicion that the individual is armed and presently dangerous.  <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 373, 113 S. Ct. 2130, 2136 (1993); <u>United States v. Powell</u>, 666 F.3d 180, 184 (4th Cir. 2011); <u>United States v. Hernandez-Mendez</u>, 626 F.3d 203, 211 (4th Cir. 2010). "Reasonable suspicion is a particularized and objective basis for suspecting that the person to be frisked is armed and dangerous."  <u>Powell</u>, 666 F.3d at 185-86. "If a *Terry* frisk exceeds the bounds of a protective pat down for weapons, it is no longer permissible, and its fruits should be suppressed."  <u>Hernandez-Mendez</u>, 626 F.3d 203.  The Government bears the burden of establishing reasonable suspicion. <u>Powell</u>, 666 F.3d at 186.

As an initial matter, the <u>Terry</u> frisk in this case occurred while Defendants were detained without reasonable suspicion of criminal activity.   Although Detective Smith ordered the Defendants out of the red Mazda within

approximately three minutes of initiating the traffic stop, the officers did not conduct a pat down for weapons at that time. Instead, the pat down occurred after Officer Velez received confirmation from dispatch that Defendant Wilson had a valid license and neither Defendant had outstanding warrants for their arrest. Because the Court has already ruled that Beck did not alert and that without the dog alert the officers lacked reasonable suspicion of criminal activity to continue to detain Defendants, irrespective of whether they chose not to release the vehicle back to them, the Defendants should have been released and told they were free to go prior to when the Terry frisk occurred.

Even assuming that the Defendants were properly detained at the time the Court also finds that the Government has failed to meet its burden of demonstrating that the officers had a reasonable suspicion that either Defendant was armed and presently dangerous. First, the testimony of the officers themselves belies the notion that they had a reasonable suspicion that Defendants were armed. Defendants were cooperative, they kept their hands where Detective Smith could see them, they did not reach to an area of their body or the car where a gun might be hidden, they did not appear nervous, and Detective Smith did not notice anything suspicious when the Defendants exited the vehicle. Detective Smith himself testified that he did not suspect that Defendants were armed. Similarly, the

officer who actually performed the pat down of the Defendant, Officer Neadeau, testified that she had no reasonable suspicion that either Defendant was armed at the time of the frisk.

Second, the fact that the officers on the scene saw no need to immediately pat down either Defendant after they were removed from the car belies any reasonable suspicion that either Defendant was armed.  Even the officer who called Officer Neadeau to the scene to perform the pat down testified that he was not concerned enough that Defendant Wilson had a weapon to pat her down himself during the approximately twenty minutes that he stood near her.   If the officers had a reasonable suspicion that Defendants were armed and dangerous and that their safety might be at risk, they would have immediately patted down Defendants upon getting them out of the car and starting the search of the red Mazda.

Third, Officer Velez had a prior encounter with Defendant Wilson when he pulled her over on September 12, 2012.  Officer Velez knew the identity of Defendant Wilson, and the conduct of Defendant Wilson from this prior encounter would have lessened any concern that Defendant Wilson might be armed and dangerous.

Fourth, the earlier statements by an informant to an officer who did not order the pat down and was not even on the scene at the time that Baby D carried a pistol

fails to demonstrate that the officers on the scene had a reasonable suspicion that either Defendant was armed and dangerous at the time of the traffic stop.

Fifth, the officers had not discovered drugs in the vehicle and the Court has already ruled that Officer Cox's testimony that Beck alerted to the presence of narcotics is not credible.

Considering the totality of the circumstances, the Court finds that the Government has failed to demonstrate that the officers had reasonable suspicion that either Defendant was armed and dangerous such as to justify a Terry frisk. Because the pat down of Defendant Raymond was not consensual and was not based on a reasonable belief that she was armed and dangerous, the search violated the Fourth Amendment, and the evidence that was ultimately found as a result of the pat down must be suppressed. Finally, absent the discovery of the pills on Defendant Raymond, there was no basis to arrest Defendants and take them into custody. Accordingly, the Court **RECOMMENDS** that the District Court **GRANT** the motions to the extent they move to suppress the pills found during the search of Defendants' persons.

## C. The Search Warrant

Finally, Defendants challenge the search warrant issued to search the Maple Ridge Apartment. In reviewing a search warrant, the Court looks to whether the

judge issuing the search warrant had a substantial basis for concluding that probable cause existed. United States v. Richardson, 607 F.3d 357, 369 (4th Cir. 2010); United States v. Williams, 974 F.2d 480, 481 (4th Cir. 1992). "A probable cause assessment requires the issuing judge to decide whether, given the totality of the circumstances, there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" Richardson, 607 F.3d at 369 (quoting, Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317 (1983))

> In order to establish probable cause, the facts presented to the magistrate need only "warrant a man of reasonable caution" to believe that evidence of a crime will be found. *Texes v. Brown*, 460 U.S. 730, 742, 103 S. Ct. 1535, 1543, 75 L.E.2d 502 (1983) (plurality opinion). The probable cause standard "does not demand showing that such a belief be correct or more likely true than false." *Id.*

Williams, 974 F.2d at 481. Ordinarily, the exclusionary rule renders the fruits of a search conducted in violation of the Fourth Amendment inadmissible. United States v. Doyle, 650 F.3d 460, 466 (4th Cir. 2011).

In United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405 (1984), however, the Supreme Court established a good faith exception to the exclusionary rule where evidence is obtained pursuant to a search warrant. "As the Supreme Court instructed in *Leon*, a court should not suppress the fruits of a search conducted under the authority of a warrant, even a subsequently invalidated warrant, unless a reasonably well trained officer would have known that the search was illegal

despite the magistrate's authorization." United States v. Williams, 548 F.3d 311, 317 (4th Cir. 2008) (internal quotations and citation omitted); see also United States v. Wellman, 663 F.3d 224, 228 (4th Cir. 2011). Thus, the exclusionary rule applies where the officer's reliance on the warrant was objectively reasonable. United States v. McKenzie-Gude, 671 F.3d 452, 458-59 (4th Cir. 2011); Doyle, 650 F.3d at 467. The Fourth Circuit, however, has recognized four circumstances in which the Leon exclusionary rule would not apply:

> (1) when the affiant based his application on knowing or reckless falsity; (2) when the judicial officer wholly abandoned his role as a neutral and detached decision maker and served merely as a "rubber stamp" for the police; (3) when the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant was so facially deficient that the executing officers could not reasonably have presumed that the warrant was valid.

Wellman, 663 F.3d at 228-29; see also Doyle, 650 F.3d at 467.

Irrespective of the validity of the search warrant for the Maple Ridge Apartment, the reliance on the search warrant by the officers executing the warrant was objectively reasonable. As a result, the Court need not address whether probable cause supported the search warrant in light of the Court's finding that the dog did not alert and the subsequent search of Defendants' person was improper. Although the Court finds Officer Cox's testimony that the dog alerted to the presence of narcotics not be credible, and the subsequent warrantless search of

Defendants to violate the Fourth Amendment, the affiant did not base the application on knowing or reckless falsity, there is no evidence in the record that Judge Letts served merely as a rubber stamp for the police, the affidavit supporting the warrant was not so lacking in probable cause as to render official belief in its existence entirely unreasonable, and the warrant was not so facially deficient that the officers executing the warrant could not reasonably have presumed that it was valid. See Wellman, 663 F.3d at 228-29. Accordingly, the Court finds that the even assuming the search warrant was invalid, the exclusionary rule set forth by the Supreme Court in Leon would apply in this case, and any evidence found in the apartment during the execution of the search warrant is admissible at trial. The Court, therefore, **RECOMMENDS** that the District Court **DENY** the motions to the extent they seek to suppress the evidence found during the search of the Maple Ridge Apartment.

### III.    Conclusion

The Court **RECOMMENDS** that the District Court **GRANT in part** and **DENY in part** Defendants' Motions to Suppress [# 39 & # 42]. The Court **RECOMMENDS** that the District Court **GRANT** the motions to the extent they seek to suppress the evidence found on Defendants as a result of the two warrantless searches of their persons and **DENY** the motions to the extent they

seek to suppress the evidence found during the execution of the search warrant.

Signed: September 25, 2013

Dennis L. Howell
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(c), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>reh'g</u> <u>denied</u>, 474 U.S. 1111 (1986); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984).