# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## BRYSON CITY DIVISION
## CASE NO. 2:13-CR-2-MR-DLH

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **OPINION AND ORDER** |
| EUDINE TRENAE WILSON and | ) | |
| MARIE LUZINSKI RAYMOND. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court for resolution of the Defendants'
Motions to Suppress [Docs. 39; 42], and the Defendants' Objections [Docs.
85; 86] to the Magistrate Judge's Memorandum and Recommendation
("M&R") [Doc. 82]. For the reasons that follow, this Court will accept the
Magistrate Judge's recommendation that the search of Defendants'
persons was unconstitutional, but will reject the Magistrate Judge's
recommendation that the search of the Maple Ridge Apartment was
constitutional, and will grant Defendants' suppression motions in full.

## PROCEDURAL BACKGROUND

On February 20, 2013, the Defendants Eudine Trenae Wilson
("Wilson"), Marie Luzinski Raymond ("Raymond"), and Kandace Rhean
Griffin ("Griffin") were charged in a Bill of Indictment with conspiracy to
possess with intent to distribute a Schedule II controlled substance in

violation of 21 U.S.C. § 841(a)(1). [Doc. 5]. Defendants Wilson and Raymond were also charged with possession with intent to distribute oxycodone in violation of 21 U.S.C. § 841(a)(1). [Id.].

On April 22, 2013, Defendants Wilson and Raymond each filed a motion to suppress. [Docs. 39, 42]. The Magistrate Judge heard the Defendants' suppression motions over the course of two days in June 2013. On September 25, 2013, Magistrate Judge Howell issued his M&R. [Doc. 82]. He recommended that the Court grant in part and deny in part Defendants' suppression motions. In particular, the Magistrate Judge recommended that the Court find unconstitutional the warrantless search of the Defendants' persons, following the stop of their car, but recommended the Court find lawful the subsequent warrant-based search of the apartment where Wilson and Raymond stayed. [Id. at 45-6]. The Magistrate Judge informed the parties they could file any objections to his M&R within fourteen days' of service thereof. [Id. at 47]. Raymond filed her objections on October 7, 2013, [Doc. 85] and Wilson filed a document adopting Raymond's objections the following day. [Doc. 86].

The Defendants' Motions to Suppress and Objections to the M&R are now ripe for the Court's consideration.

## STANDARD OF REVIEW

Since the Defendants have raised various specific factual and legal objections to the Magistrate Judge's Memorandum and Recommendation, the Court will review the Magistrate Judge's proposed findings and conclusions *de novo.*  28 U.S.C. § 636(b)(1); Fed.R.Crim.P. 59(b)(3).

## FACTUAL BACKGROUND

The factual background of this case is extensive. The Defendants object only to the omission of certain facts from Magistrate Judge Howell's comprehensive factual recitation contained in his M&R.  The alleged factual omissions, according to the Defendants, affect only the determination of the validity of the search warrant at issue.   The Court will adopt Magistrate Judge Howell's factual findings as reproduced below, with minor modifications from his M&R based upon the Court's review of the suppression hearing transcript.

I.   <u>The September 18, 2012, Traffic Stop and Subsequent Investigation.</u>

In early 2012, the Cherokee Indian Police Department ("CIPD") was investigating Kandace Griffin and Justina Rattler for selling oxycodone on the Cherokee Indian Reservation in North Carolina.  (Supression Hr'g Tr. 142, 212; Jun. 20, 2013).  In May of 2012, CIPD Detective Shawn Birchfield relayed to his colleague Detective Matthew Shiver that a black female was

staying in a local hotel, paying cash for her room, and selling oxycodone pills to Justina Rattler.[1] (Hr'g Tr. 214; Jun. 20, 2013). On September 18, 2012, Shiver received information from a person he knew[2] that a young black female was at Griffin's residence in Cherokee, and that this female was a source of oxycodone for Griffin. (Hr'g Tr. 216-18; Jun. 20, 2013). Detective Shiver asked CIPD Sergeant Daryl Martin to drive by the Griffin residence and get a vehicle description plus the tag number of the vehicle at the residence. (Hr'g Tr. 5-6; Jun. 12, 2013; Hr'g Tr. 216, 218; Jun. 20, 2013).

Sergeant Martin drove by the Griffin residence that same day and observed a black vehicle with a New York tag. (Hr'g Tr. 6-7; Jun. 12, 2013). Martin turned over the vehicle information to Shiver who then ran it through dispatch and discovered that the car was a black Mazda rented from Hertz. (Hr'g Tr. 218-19, Jun. 20, 2013). At some point on either September 18 or 19, 2012, DEA Task Force Officer Courtney Mumm

---

[1]The record does not indicate the circumstances of how, or from whom, Det. Birchfield learned of this information.

[2]In the Search Warrant Application, the affiant refers to this information coming from "an anonymous tip[.]" [Doc. 49-1 at 6, ¶2]. At the suppression hearing, Det. Shiver admitted he knew the person who gave him the information but that such person was not an informant working for him. "It was just random information I received from this person." (Hr'g Tr. 217; Jun. 20, 2013). Subsequently, Shiver testified that this person provided information that later led to three arrests but Shiver did not know whether any of the three arrests in turn led to any convictions or what the status of those three cases were. (Hr'g Tr. 269-70; Jun. 20, 2013).

generated an administrative subpoena which was served on Hertz. (Hr'g Tr. 143; Jun. 12, 2013). Hertz disclosed that an individual named David Delly had rented the black Mazda. (Hr'g Tr. 144; Jun. 12, 2013). Billy Stites, another DEA Task Force Officer, as well as a Bureau of Indian Affairs Special Agent, researched David Delly and discovered an open investigation by the Department of Homeland Security regarding the seizure of currency at the Asheville airport. (Hr'g Tr. 144; Jun. 12, 2013). TFO Stites learned that in February of 2012, the Transportation Security Administration discovered over $30,000.00 in cash concealed in Delly's luggage. (Hr'g Tr. 144, 147; Jun. 12, 2013).

Also, on September 18, 2012, an individual called the CIPD headquarters shortly after Sgt. Martin drove past Griffin's home. CIPD dispatch fielded the call, provided Martin with the caller's phone number, and requested he return the individual's call. (Hr'g Tr. 18; Jun. 12, 2013). When Martin called the phone number provided by dispatch, a woman who identified herself as "Justina" answered the phone. (Hr'g Tr. 8-9, 19; Jun. 12, 2013). Sergeant Martin recognized the individual's voice as Justina Rattler. Martin knew Rattler based on his personal dealings with her in the past concerning driving violations and calls stemming from domestic issues. (Hr.'g Tr. 20-22; Jun. 12, 2013). Martin, however, had never

5

previously dealt with Rattler regarding any drug issues. (Hr.'g Tr. 22; Jun. 12, 2013).

Ms. Rattler began the conversation by asking Martin what the police were doing at Griffin's residence. (Hr'g Tr. 9, 19, 23; Jun. 12, 2013). She then informed Martin that a black female known as "Baby D" was the driver of the black vehicle parked at the Griffin residence. (Hr'g Tr. 9, 19; Jun. 12, 2013). Martin asked Rattler for Baby D's true name but Rattler did not know her name.[3] (Hr'g Tr. 19; Jun. 12, 2013). Rattler told Martin that Baby D sold "roxies"[4] to Griffin, and that she (Rattler) had personally bought roxies from Baby D on one occasion earlier in the year. (Hr'g Tr. 10-12, 19, 23; Jun. 12, 2013). Rattler did not disclose to Martin whether she (Rattler) was selling roxies, only that she previously bought roxies from Baby D in 2012. (Hr'g Tr. 12; Jun. 12, 2013). Finally, Rattler informed Martin that Baby D was staying at a motel or cabin ten minutes from Griffin's house and that Baby D had pills and approximately $10,000 in cash located there. (Hr'g Tr. 12, 19-20; Jun. 12, 2013). Rattler did not know the address where Baby D was staying. (Hr'g Tr. 25; Jun. 12, 2013).

---

[3]Contrary to what is stated in the Search Warrant Application, Rattler did *not* identify the black female as "Eudine Wilson" since Rattler did not know Baby D's true name. [Doc. 49-1 at 6, ¶4].

[4]"Roxicodone" is a registered trademark of Xanodyne Pharmaceuticals, Inc. It is the brand name for oxycodone tablets, hence "roxies."

Sergeant Martin then relayed to Detective Shiver the information Rattler had given him. (Hr'g Tr. 27; Jun. 12, 2013; Hr'g Tr. 219-21; Jun. 20, 2013). Shiver in turn asked his fellow officers to look out for the black Mazda with New York tags while driving about. (Hr'g Tr. 221-22; Jun. 20, 2013). The following day, various law enforcement officers made a point of looking for the car. (Hr'g Tr. 221-22; Jun. 20, 2013). Shiver was looking in the Bryson City area; Swain County Det. William Reed was checking Highway 74 coming from Sylva; Swain County Det. Roger Neadau was checking around the Reservation; and CIPD Det. Jeff Smith actually spotted the black Mazda parked at the Maple Ridge Apartments as he was driving from Swain County into Cherokee. (Hr'g Tr. 221-2, Jun. 20, 2013; Hr'g Tr. 32, 53, Jun. 12, 2013). Smith drove into the parking lot for the apartment complex and wrote down the tag number. He then passed the vehicle information on to TFO Stites. (Hr'g Tr. 33, 55-56; Jun. 12, 2013). Detective Smith and other CIPD officers then set up surveillance on the black Mazda. (Hr'g Tr. 33, 56; Jun. 12, 2013).

While he was watching the black Mazda, Smith saw a black female get into the vehicle and leave the apartment. (Hr'g Tr. 34, 59; Jun. 12, 2013). Smith contacted CIPD Patrol Officer David Velez to let him know that the suspect vehicle had left the apartment. (Hr'g Tr. 34, 58, 99-100,

169, 170; Jun. 12, 2013).   Smith told Velez to try and find reasonable suspicion to pull the black Mazda over and identify the driver.   (Hr'g Tr. 58-59, 100; Jun. 12, 2013).

Officer Velez, accompanied in his patrol car by Lt. Glen Welch, located the black Mazda on Highway 19 and proceeded to drive his vehicle alongside the Mazda.   (Hr'g Tr. 170-71; Jun. 12, 2013).   At that point, Welch told Velez that the driver of the black Mazda was not wearing her seat belt.   (Hr'g Tr. 171, 212, 215; Jun. 12, 2013).   Velez then dropped back behind the black Mazda and activated his blue lights.   (Hr'g Tr. 171; Jun. 12, 2013).   Once the Mazda pulled over, Velez approached the vehicle and informed the driver that he was pulling her over because she was not wearing her seatbelt.   (Hr'g Tr. 171-2; Jun. 12, 2013).   The driver, however, protested and stated that she was in fact wearing her seatbelt. (Hr'g Tr. 172; Jun. 12, 2013).  Officer Velez asked the driver for her license and had dispatch run the driver's license and license plate number.  (Hr'g Tr. 172, 212; Jun. 12, 2013).  Velez learned that the driver of the black Mazda was Defendant Eudine Wilson.   (Hr'g Tr. 171; Jun. 12, 2013). Because Wilson had a valid license and no outstanding warrants, Velez allowed her to leave. (Hr'g Tr. 201; Jun. 12, 2013).  When Velez was later asked during the Defendants' suppression hearing whether he believed

Wilson was in fact wearing her seatbelt at the time of the stop, Velez responded, "I would say yes she had her seatbelt on."[5]  Velez did not issue her a citation.  (Hr'g Tr. 213, 239; Jun. 12, 2013).   The entire incident lasted approximately ten to twelve minutes.  (Hr'g Tr. 172; Jun. 12, 2013).

According to Det. Shiver, on September 20, 2012, he and Smith[6] together interviewed a confidential source about the distribution of oxycodone in Cherokee.  (Hr'g Tr. 224; Jun. 20, 2013).  CIPD Officer Dike Sneed introduced the CS to Shiver and Smith.  (Hr'g Tr. 226, 274; Jun. 20, 2013).  Although Shiver and Smith had never used this source before, Sneed related to them, without any elaboration, that this CS had been reliable and honest in the past.  (Hr.'g Tr. 226, 274, 286; Jun. 20, 2013).  Shiver admitted, since he had never used this CS in the past, that he had no first-hand knowledge concerning the CS's reliability.    (Hr.'g Tr. 226; Jun. 20, 2013).

During the interview, the CS informed the detectives that two black women would bring pills to Cherokee for an individual known to the CS as "Mr. Ed."  (Hr'g Tr. 224; Jun. 20, 2013).   Mr. Ed also would send two black

---

[5]The Defendants did not seek to suppress the information the police obtained from Wilson during this stop.

[6]Detective Smith testified that he could not recall having interviewed this confidential source with Detective Shiver.   (Hr'g Tr. 61; Jun. 12, 2013; Tr. 223; Jun. 20, 2013).

Haitian men to accompany the women for protection and the women would deliver the pills to Griffin. (Hr.'g Tr. 224; Jun. 20, 2013). One of the women was known to the CS as Baby D and she drove the black Mazda rental car located at the Maple Ridge Apartments. (Hr'g Tr. 224-25; Jun. 20, 2013). The CS told Shiver and Smith that, approximately six months prior to the interview, Griffin and her boyfriend John Cameron George, tried to rob Baby D and the other unknown black female. As a result, according to the CS, Baby D carried a pistol and that she would leave the pills in the apartment even when she was gone. (Hr.'g Tr. 225; Jun. 20, 2013).

Shiver testified that some of what the CS provided to him and Smith on September 20, 2012, was consistent with information Shiver received from another informant the week before, on September 13, 2012. (Hr.'g Tr. 225; Jun. 20, 2013). This other informant had told Shiver that he had purchased oxycodone at Griffin's house and that the person bringing the drugs was a black female who drove an SUV with Texas license plates. This informant further related that the black female had been to Griffin's house numerous times in the past three to four months. (Hr.'g Tr. 228; Jun. 20, 2013). The September 13 informant did not say anything to corroborate the other CS's statements about any attempted robbery, Haitian men, or weapons.

## II. The October 11, 2012, Traffic Stop and Subsequent Search Warrant Application.

On the morning October 11, 2012, Detective Smith drove by the Maple Ridge Apartments on his way to work and saw a red Mazda sitting in approximately the same parking spot the black Mazda had occupied the month before. (Hr'g Tr. 35; Jun. 12, 2013). Smith circled back to the Maple Ridge Apartments and wrote down the tag number for the red Mazda which displayed a Louisiana license plate. (Hr'g Tr. 35; Jun. 12, 2013). Smith passed the vehicle information on to TFO Stites. (Hr'g Tr. 35, 148; Jun. 12, 2013).

Sometime between Velez's traffic stop of Wilson driving the black Mazda on September 18, 2012, and Smith's observation of the red Mazda on October 11, 2012, Shiver was able to deduce that Wilson was the person known as Baby D. During that timeframe, Shiver searched the Internet using the name Eudine Wilson and came upon Wilson's Facebook page. (Hr'g Tr. 235; Jun. 20, 2013). Wilson's Facebook page contained a birthday flier that referred to Wilson as "Baby Dean."

Later on October 11, 2012, after TFO Stites received the red Mazda license plate information from Smith, Stites had issued a second subpoena to Hertz. In response to the subpoena, Hertz revealed that the red Mazda had been rented by David Delly at the Naples airport in Florida. (Hr'g Tr.

11

148-49, 152, 156-57; Jun. 12, 2013). Coincidentally, Shiver was present when Stites received the information from Hertz. (Hr'g Tr. 158; Jun. 12, 2013; Hr'g Tr. 231-32, 276; Jun. 20, 2013).

Agent Stites was able to confirm that the David Delly who rented the red Mazda was the same individual who was then under investigation by the Department of Homeland Security by comparing his date of birth, address, and phone number. (Hr'g Tr. 161; Jun. 12, 2013). Stites also received a copy of the rental agreement, which did not list other drivers authorized to operate the red Mazda. (Hr'g Tr. 157; Jun. 12, 2013; Gov.'s Ex. 2.) In addition to receiving a copy of the rental agreement, Stites and Shiver also spoke to a Hertz security specialist about the red Mazda rental agreement. (Hr'g Tr. 156, 166; Jun. 12, 2013). The security specialist informed Stites and Shiver that there were no written user authorization forms contained in the centralized Hertz computer system and that David Delly was, therefore, the only authorized driver of the vehicle. (Hr'g Tr. 167-68; Jun. 12, 2013). Stites communicated this information back to Smith who then set up surveillance over the red Mazda. (Hr'g Tr. 35, 158; Jun. 12, 2013; Hr'g Tr. 232; Jun. 20, 2013).

As he had done the month before, Det. Smith reached out to other local law enforcement officers for assistance in the event he (or another

officer conducting surveillance of the red Mazda) was able to make a traffic stop of the car. (Hr.'g Tr. 232; Jun. 20, 2013). He again contacted Swain County detectives William Reed and Roger Neadau. He notified patrol Officer Velez. Smith also contacted CIPD Sergeant Carla Neadau, telling her that she might be needed later in the day to conduct a "female search." (Hr'g Tr. 276-77; Jun. 12, 2013; Hr'g Tr.232; Jun. 20, 2013). Finally, he contacted Graham County detectives Matthew Cox and Kade Adams. Cox was contacted because he was a drug detection K-9 handler for the Graham County Sheriff's Office. (Hr'g Tr. 78, 119, 232; Jun. 20, 2013; Hr'g Tr. 65; Jun. 12, 2013). Smith asked Cox to bring his K-9, Beck, because Beck might be needed.[7] (Hr'g Tr. 65; Jun. 12, 2013; Hr'g Tr. 121, 176; Jun. 20, 2013). After receiving Smith's call, Cox loaded Beck into his vehicle and drove to the Hungry Bear gas station in Cherokee, which was the designated meeting place. (Hr'g Tr. 107; Jun. 20, 2013).

---

[7]The CIPD had two detection dogs and handlers on staff, one such handler being Sgt. Martin, the officer who received the unsolicited call from Justina Rattler discussed supra at 5-6. Det. Shiver had no explanation why he did not enlist the help of his own department's two detection dogs and handlers. (Hr'g Tr. 233; Jun. 20, 2013). Similarly, Det. McCoy, the Search Warrant Application affiant from Jackson County, see infra at 27, testified that his Sheriff's department had three detection dogs available but no one contacted him about the use of these dogs. (Hr'g Tr. 62-3; Jun. 20, 2013). Graham County, where Det. Cox and K-9 Beck are employed, is a much greater geographical distance away from Cherokee than either Jackson County or Swain County, which are the two counties in which the vast majority of the Reservation is located.

13

Detective Reed set up surveillance of the red Mazda at the Maple Ridge Apartments. (Hr'g Tr. 36, 125; Jun. 12, 2013). Reed was in an undercover vehicle that did not have blue lights. (Hr'g Tr. 128-29; Jun. 12, 2013). Around noon, Reed witnessed two black females exit the apartment and get into the red Mazda. (Hr'g Tr. 126-27; Jun. 12, 2013). Defendant Wilson, one of the two women, placed something in the back seat of the vehicle and either she or the other woman, later determined to be Defendant Raymond, placed a white bag in the trunk. (Hr'g Tr. 127; Jun. 12, 2013). Wilson got into the car as the driver and Raymond as the passenger. (Hr'g Tr. 128-29; Jun. 12, 2013). Reed did not observe any black males. (Hr'g Tr. 129; Jun. 12, 2013).

Detective Reed followed the red Mazda for approximately two miles until Smith fell in behind the red Mazda. (Hr'g Tr. 37, 130; Jun. 12, 2013). Smith was driving an unmarked patrol vehicle that was equipped with blue lights. (Hr'g Tr. 39; Jun. 12, 2013). While following Wilson, Smith observed the red Mazda go left of the center double yellow lines on the highway three times. (Hr'g Tr. 37-8; Jun. 12, 2013). When Smith reached a safe place in the road to pull over the red Mazda, he turned on his blue lights and initiated a traffic stop. (Hr'g Tr. 39; Jun. 12, 2013). Officer Velez, who was behind Smith, pulled his marked cruiser in front of Smith's

14

vehicle and directly behind the red Mazda. (Hr'g Tr. 40, 173-74; Jun. 12, 2013). Velez's patrol car was equipped with an audio and video recording camera that was operational throughout the traffic stop. (Hr'g Tr. 176; Jun. 12, 2013). The two officers then approached the red Mazda. (Hr'g Tr. 40, 173-74, Jun. 12, 2013.)

Officer Velez approached the driver's side and Smith approached the passenger side of the red Mazda. (Hr'g Tr. 40, 174; Jun. 12, 2013). At the Mazda, Smith observed both Defendants typing on their cell phones, and he asked them to please refrain from typing, texting, or making calls on the phone. (Hr'g Tr. 40; Jun. 12, 2013). Both Defendants complied. (Hr'g Tr. 40, 78; Jun. 12, 2013). Detective Smith explained to Wilson that she was being pulled over for crossing the double yellow line on more than one occasion. (Hr'g Tr. 41, 76, 198; Jun. 12, 2013). Until Velez heard Smith tell Wilson the reason why he pulled her over, Velez did not know the basis for the stop. (Hr'g Tr. 198; Jun. 12, 2013). Officer Velez did not have his citation book with him at the time. (Hr'g Tr. 198; Jun. 12, 2013). While the officers were talking to the Defendants, Wilson kept her hands where Smith could see them, did not reach between the seat or the console, did not make any aggressive movements, and was not acting scared or nervous.

(Hr'g Tr. 78-9; Jun. 12, 2013).   Further, Smith had no concerns that Wilson was driving while impaired.  (Hr'g Tr. 80, 108; Jun. 12, 2013).

Officer Velez asked Wilson for her driver's license and registration. (Hr'g Tr. 175, 200; Jun. 12, 2013).  Defendant Wilson provided Velez with her driver's license and a copy of the rental agreement for the vehicle. (Hr'g Tr. 175; Jun. 12, 2013).   Detective Smith asked Raymond for her license and she handed it to Velez.  (Hr'g Tr. 106-08, 180; Jun. 12, 2013).  Officer Velez then returned to his patrol car and radioed in the license plate number and driver's license information.  (Hr'g Tr. 41, 175, 201; Jun. 12, 2013).   Detective Smith remained at the passenger side door of the vehicle watching the Defendants.  (Hr.'g Tr. 81; Jun. 12, 2013).

While Smith and Velez spoke with the Defendants, other officers arrived on the scene.  (Hr'g Tr. 77; Jun. 12, 2013).  Detective Cox arrived with his K-9 Beck shortly after Smith initiated the traffic stop.  (Hr.'g Tr. 127-28; Jun. 20, 2013).   After assessing the scene, Cox gave Beck the command to sniff around the exterior of the Mazda.  (Hr'g Tr. 127-28; Jun. 20, 2013).   None of the officers informed Defendants about Beck's deployment prior to its occurrence.  (Hr.'g Tr. 83-84; Jun. 12, 2013).   At the time of the dog sniff, there were at least four armed law enforcement officers on the scene.  (Hr'g Tr. 162-63; Jun. 20, 2013).

16

Detection dogs like Beck are animals trained to identify certain precise odors, such as drugs, explosives, or corpses. [8] (Hr'g Tr. 298; Jun. 20, 2013). Beck is a detection dog trained to identify the odor of three specific drugs: heroin, cocaine, and marijuana. (Hr'g Tr. 87; Jun. 20, 2013). Beck is not trained to detect the odor of lawfully prescribed pharmaceuticals, and a dog trained to detect the scent of heroin will not alert to the odor of oxycodone pills. (Hr'g Tr. 175, 317, 351; Jun. 20, 2013).

A drug detection dog is trained to sniff for a stimulus odor[9] and to follow that odor to its source if possible or otherwise to its strongest point. (Hr'g Tr. 303, 325; Jun. 20, 2013). In the process of closing in on the source of an odor, a detection dog will become excited and undergo behavioral changes. (Hr'g Tr. 306; Jun. 20, 2013). Some behavioral changes include increased tail wagging, heavy breathing, and variations in

---

[8]The Magistrate Judge determined witness Bobby Blackwell, a deputy with the Alleghany County Sheriff's department, and the owner of Objective First Tactical K-9, to be an expert in the field of detection dog training and detection dog handler training and to be a credible witness. (Hr'g Tr. 302; Jun. 20, 2013). In contrast to the one year of experience as a dog handler Cox had at the time of the traffic stop, Blackwell had been training dogs for twenty-five years and drug detection dogs for nineteen years. (Hr'g Tr. 78, 296-98; Jun. 20, 2013). The Court agrees with Judge Howell's expert and credibility determinations regarding Blackwell, especially since he had the "ability to observe [the] witnesses' demeanor firsthand." United States v. Robertson, -- F.3d ---, No. 12-4486 (4th Cir. Dec. 3, 2013).

[9]"A detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone (just as a police officer's much inferior nose detects the odor of marijuana for some time after a joint has been smoked)." Florida v. Harris, 133 S. Ct. 1050, 1056 n.2. (2013).

17

posture. (Hr'g Tr. 325; Jun. 20, 2013). These behavioral changes exemplify the dog's balladromic process. When a handler notices these changes in behavior, the handler will ordinarily work the dog in the area where the change of behavior occurs. This assists the dog to advance toward the source of the odor and to permit the dog to give his trained indication upon pinpointing the odor's source. (Hr'g Tr. 135-36, 165, 307-09; Jun. 20, 2013). Similarly, a detection dog which has hit upon an odor but thereafter loses it will undergo behavioral changes as well. Detection dog handlers are trained to recognize when a dog has lost the scent and it becomes the handler's responsibility to work the dog back into the odor if possible. (Hr'g Tr. 332; Jun. 20, 2013).

When a detection dog ultimately arrives at the source of a stimulus odor, or when the dog gets as close to the stimulus odor as it possibly can, it will give its trained indication, commonly referred to as an "alert." (Hr'g Tr. 325; Jun. 20, 2013). A dog's trained indication can take one of two forms: an active alert, or a passive alert. (Hr'g Tr. 303; Jun. 20, 2013). An active alert is characterized by the dog digging or pawing to get to the source of the odor. A passive alert is characterized by the dog sitting and staring at the location of the source of the odor. (Hr'g Tr. 303; Jun. 20, 2013). The handler is looking for the dog's trained indication to signify the probable

presence of the source of the odor. (Hr'g Tr. 308; Jun. 20, 2013). Beck is a passive alert dog. (Hr'g Tr. 157-58, 302; Jun. 2, 2013). Thus, sitting and staring is Beck's trained indication – his alert – that he has located the source of the odor of any of the three narcotics he has been taught to detect. (Hr'g Tr. 94-95, 172-73, 182, 306; Jun. 20, 2013).

Beck began sniffing the exterior of the Mazda approximately two minutes after it came to a stop. (Gov. Ex. 4a). When Beck began his sniff, Velez was back at his patrol car running the tag and license information (Gov. Ex. 4a; Hr'g Tr. 175; Jun. 12, 2013), and Smith was standing next to the Mazda, approximately three feet from the passenger door. (Hr'g Tr. 82; Jun. 12, 2013; Hr'g Tr. 128, 137; Jun. 20, 2013; Gov. Ex. 4a). Detective Cox testified that he does not want other persons standing close to a vehicle when he conducts a dog-sniff with Beck because it could hinder the sniff. (Hr'g Tr. 141-42, Jun. 20, 2013.) He did not, however, ask Smith to move away from the Mazda prior to conducting the sniff. (Hr'g Tr. 142; Jun. 20, 2013; Gov. Ex. 4a).

Beck began by sniffing the rear bumper of the car and then worked his way around to the passenger side of the Mazda. (Hr'g Tr. 132; Jun. 20, 2013). After turning the passenger-side rear corner, Beck left the side of the car and moved toward Smith, placing his head down in the area where

19

Smith's feet were located. (Hr'g Tr. 137, 145; Jun. 20, 2013). Beck displayed changes in his behavior when he moved to Smith. (Hr'g Tr. 148, 152; Jun. 20, 2013). Beck lowered his head, changed his gait, and appeared to sniff at Smith's feet. (Hr'g Tr. 147-49; Jun. 20, 2013; Hr.Tr. 86; Jun. 12, 2013; Gov.'s Ex. 4a). Detective Cox gave Beck a "nay" command and then redirected him away from Smith and back to the passenger side of the Mazda. (Hr'g Tr. 137, 152; Jun. 20, 2013). Beck then completed the sniff around the exterior of the car. (Gov.'s Ex. 4a). Beck circled the car once and the entire sniff took less than thirty seconds. (Gov. Ex. 4a; Hr'g Tr. 167; Jun. 20, 2013; Hr'g Tr. 85, Jun. 12, 2013). It is undisputed that Beck never gave his trained indication; at no point did he sit and stare. (Hr'g Tr. 148, 173; Jun. 20, 2013).

Detective Cox, however, informed Smith that Beck alerted to the passenger side door. (Hr'g Tr. 156-57; Jun. 20, 2013; Hr'g Tr. 90, 111; Jun. 12. 2013). Even though Beck did not sit and stare, Cox maintained that Beck nevertheless alerted due to behavioral changes Cox observed in Beck, particularly Beck's change in breathing. (Hr.'g Tr. 161, 165; Jun. 20, 2013). In fact, Cox testified that the only difference in behavior that he observed between Beck sniffing Smith's feet and Beck purportedly alerting to the passenger door was that Beck's breathing changed. (Hr'g Tr. 161,

168, 179, 181-82; Jun. 20, 2013). Although Cox testified it would have taken him less than a minute to work Beck back around the Mazda to give Beck the opportunity to investigate the passenger side door for any detectable odor, he decided not to take Beck around the vehicle a second time. (Hr.'g Tr. 167-68; Jun. 20, 2013).

Upon seeing the dog, Smith stated Defendant Raymond appeared a little more agitated and asked why the dog was present. (Hr'g Tr. 84-85; Jun. 12, 2013). Neither he nor Cox responded. (Hr'g Tr. 84-85; Jun. 12, 2013). At some point while Beck was circling the red Mazda, Wilson reached down and picked up her phone. (Hr'g Tr. 87; Jun. 12, 2013). As Wilson was holding the flip phone open in her hand, Smith asked her to refrain from using it. (Hr'g Tr. 87; Jun. 12, 2013). In response, Wilson broke the flip phone in half at the hinge. (Hr'g Tr. 88; Jun. 12, 2013).

Prior to this point Wilson had not acted angry. (Hr'g Tr. 87; Jun. 12, 2013). Likewise, Wilson was not doing anything that raised any safety concern for Smith or Velez; she was not acting nervously, she kept her hands where Smith could see them, she was not sweating heavily, she was not using the phone in a threatening manner, and she was not acting suspicious. (Hr'g Tr. 87-90; 207 Jun. 12, 2013). Around this same time, Cox informed Smith that Beck alerted. (Hr'g Tr. 89-90; Jun. 12, 2013).

21

Smith testified that he then asked the Defendants to step out of the car under the premise that Wilson broke her phone. (Hr'g Tr. 115-16, 134; Jun. 12, 2013). Defendants complied with Smith's instruction and exited the vehicle. (Hr'g Tr. 90; Jun. 12, 2013). Detective Smith did not observe anything about the way the Defendants exited the vehicle that raised any safety concerns for him. (Hr'g Tr. 90; Jun. 12, 2013). Detective Smith did not suspect that the Defendants were armed. (Hr'g Tr. 113; Jun. 12, 2013).

After exiting the Mazda, Wilson was taken to the front of Velez's patrol vehicle by Reed, and Raymond was escorted to the rear of Velez's vehicle. (Hr'g Tr. 91, 134; Jun. 12, 2013). Neither Defendant was placed in handcuffs. (Hr'g Tr. 113; Jun. 12, 2013). Reed asked Wilson to face Velez's vehicle and place her hands on the vehicle's front push bar. (Hr'g Tr. 134-35; Jun. 12, 2013). Reed did not observe Wilson do anything that raised any safety concerns for him. (Hr'g Tr. 136; Jun. 12, 2013).

Approximately two minutes after Wilson exited the Mazda, dispatch informed Velez that Wilson's license was valid and she did not have any outstanding warrants for her arrest. (Gov.'s Ex. 4a; Hr'g Tr. 201; Jun 12, 2013). At this point, Smith began to search the Mazda. (Gov.'s Ex. 4a; Hr'g Tr. 91, Jun. 12, 2013.) Approximately one minute after dispatch relayed the information that Wilson's license was valid, dispatch informed

22

Velez that Raymond's license was invalid but that she did not have any outstanding warrants for her arrest. (Gov.'s Ex. 4a; Hr'g Tr. 201-02, 229; Jun. 12, 2013). Defendants, however, were not released. Also, they were not issued any traffic citation, nor were their driver's licenses returned. (Gov.'s Ex. 4a; Hr'g Tr. 214, 233, 239; Jun. 12, 2013). Neither Defendant was acting in a violent or aggressive manner, nor was Velez concerned that Wilson had a firearm on her person. ( Hr'g Tr. 206-07, 229-30, 236; Jun. 12, 2013). Ultimately, the search of the vehicle did not reveal any narcotics. (Hr'g Tr. 116; Jun. 12, 2013). The white bag officers had previously seen one of the women place in the trunk of the car back at the apartment turned out to be bag of household garbage. The items placed in the back seat of the car were innocuous personal belongings. (Hr.'g Tr. 116, 138-39; Jun. 12, 2013).

Sometime after the Defendants were removed from the Mazda, Shiver arrived on the scene. (Hr'g Tr. 241; Jun. 20, 2013). Once he arrived, Shiver approached Raymond, who was standing at the back of Velez's vehicle. (Hr'g Tr. 241; Jun. 20, 2013). Shiver testified that he observed Raymond touching and rubbing her stomach and moving her dress around. (Hr'g Tr. 241; Jun. 20, 2013). He also testified that he observed something protruding from Raymond's groin area. (Hr'g Tr. 242;

Jun. 20, 2013). Shiver, however, did not see the need to pat down Raymond nor to ask anyone else to pat her down. (Hr'g Tr. 242; Jun. 20, 2013). Velez contacted Sgt. Carla Neadau and requested that she come to the scene to perform a Terry[10] frisk of the Defendants. (Hr'g Tr. 243; Jun. 12, 2013). When she arrived on the scene, Carla Neadau went to speak with Smith who informed her that Beck had alerted to the vehicle and that he wanted her to perform a Terry frisk. (Hr'g Tr. 244-45; Jun. 12, 2013). By the time Carla Neadau arrived, there were at least seven officers on the scene and at least one other drove by during the stop. (Hr'g Tr. 104-05; Jun. 12, 2013). Four or five police vehicles were also on the scene with at least two vehicles flashing their blue lights. (Hr'g Tr. 105, 140; Jun. 12, 2013). Sgt. Neadau, like her colleagues Smith and Velez, had no reasonable suspicion that either Defendant was armed at the time. (Hr'g Tr. 280-281; Jun. 12, 2013). She nevertheless proceeded to frisk Defendants.

Sgt. Neadau first conducted a pat down of Raymond, during which she felt a soft bulge in Raymond's front groin area. (Hr'g Tr. 246-47; Jun. 12, 2013). Neadau then attempted to conduct a pat down of Wilson. (Hr'g Tr. 253; Jun. 12, 2013). Wilson, however, refused to spread her legs and

---

[10]Terry v. Ohio, 392 U.S. 1 (1968).

comply. Neadau was unable to successfully complete a search of Wilson at the time. (Hr'g Tr. 253; Jun. 12, 2013). Wilson was then returned to the front of Velez's vehicle. (Gov.'s Ex. 4a.) The attempted pat down of Wilson occurred approximately fifteen to sixteen minutes after the traffic stop was initiated. (Gov.'s Ex. 4a).

Neadau informed Shiver of the bulge she detected on Raymond, so Shiver and Neadau approached Raymond in an effort to learn more. Shiver informed Raymond about the dog alert and that they were investigating the sale of oxycodone. (Hr'g Tr. 245; Jun. 20, 2013). In response, Raymond told the two officers that she had a prescription for oxycodone. (Hr'g Tr. 245; Hr'g Tr. 254; Jun. 12, 2013). Shiver then told Raymond that he believed she had pills hidden in the bulge under her clothes and for her to give Neadau the pills. Shiver told Raymond if she had a prescription to have oxycodone, then there was nothing wrong with her possessing the drug. (Hr'g Tr. 245-47; Jun. 20, 2013).

Sgt. Neadau took Raymond to a patrol car where, shielded from view, Raymond proceeded to reach under her dress and pull out a plastic bag wrapped in a sock and toilet paper. (Hr'g Tr. 255; Jun. 12, 2013). Neadau turned the bag over to Shiver. (Hr'g Tr. 247; Jun. 12, 2013). The bag

contained fifty 30 milligram oxycodone tablets and fourteen or fifteen 2 milligram alprazolam tablets.   (Hr'g Tr. 248; Jun. 20, 2013).

Shiver told Velez to handcuff Wilson, place her in the back of his patrol car, and transport her to the CIPD.  (Hr'g Tr. 249; Jun. 20, 2013; Hr'g Tr. 183-85; Jun. 12, 2013).   Shiver told Neadau to detain Raymond and take her to the CIPD.  (Hr'g Tr. 255-56; Jun. 12, 2013).   Sgt. Neadau and Velez then separately transported the Defendants to the Cherokee Indian Police Department.   (Hr'g Tr. 185, 256; Jun. 12, 2013).   At the police department, Neadau tried to search Wilson again, but Wilson again failed to comply.  (Hr'g Tr. 258, 269; Jun. 12, 2013).   Several hours later, officers transported the Defendants to the Swain County jail.  (Hr'g Tr. 192, 209-10; Jun. 12, 2013; Hr'g Tr. 252; Jun. 20, 2013).  Swain County jail personnel performed strip searches of both Defendants based on Det. Reed's instructions.   (Hr'g Tr. 5-8, 21-23, 27; Jun. 20, 2013).   Jail personnel did not find anything on Raymond during the strip search but did find a plastic bag containing pills on Wilson.  (Hr'g Tr. 5, 9-10; Jun. 20, 2013).

Immediately before the Defendants' transport from the CIPD to the Swain County jail, Sergeant Patrick McCoy, a narcotics officer with the Jackson County Sheriff's department, met with Shiver, Stites, and Smith at the CIPD.  (Hr'g Tr. 31, 54; Jun. 20, 2013).   Stites had called McCoy

26

earlier that day (October 11, 2012) to tell him law enforcement had conducted surveillance on the Maple Ridge Apartments based on the suspicion that persons there were trafficking in narcotic pills and that they had stopped a car leaving from those apartments. (Hr'g Tr. 30; Jun. 20, 2013). Further, since the Maple Ridge Apartments were located in Jackson County, Stites asked McCoy if he would be willing to help out. McCoy agreed. McCoy had no involvement in this matter prior to the telephone call from Stites on October 11, 2012, seeking his assistance. (Hr'g Tr. 30; Jun. 20, 2013). McCoy's main objective was to help draft a Search Warrant Application in an effort to secure a Search Warrant for the Defendants' apartment at Maple Ridge from a Jackson County, North Carolina, judge. (Hr'g Tr. 31; Jun. 20, 2013).

According to McCoy, the Search Warrant Application drafting was a collaborative effort. McCoy spoke with Shiver, Stites, and Smith since McCoy played no role in the investigation prior to that day. (Hr'g Tr. 31; Jun. 20, 2013). McCoy did, however, call the manager of the Maple Ridge Apartments that day to learn who rented the apartment. (Hr'g Tr. 32; Jun. 20, 2013). The manager stated to McCoy that Apartment 10 was rented by one Eddie Delly but that Raymond was the person making the monthly rental payments. (Hr'g Tr. 33; Jun. 20, 2013). Based on this information,

27

Shiver was able to deduce that "Mr. Ed" or "Eddie" was likely David Delly. (Hr'g Tr. 227, 235; Jun. 20, 2013). Other than the information McCoy personally learned from the apartment manager about Delly and Raymond, McCoy testified that the remainder of the information set forth in the Search Warrant Application was beyond his personal knowledge, relayed to him by other officers. (Hr'g Tr. 33; Jun. 20, 2013).

Once the Search Warrant Application was complete, McCoy and Smith traveled to the home of North Carolina Superior Court Judge Bradley Letts. (Hr'g Tr. 34; Jun. 20, 2013). Judge Letts placed both officers under oath and then asked Smith a few questions. (Hr'g Tr. 43; Jun. 20, 2013). McCoy could not remember what questions Judge Letts asked Smith, but McCoy did recall that Smith did not tell the Judge anything outside of what was written in the Search Warrant Application. (Hr'g Tr. 43-4; Jun. 20, 2013). Judge Letts spent about five minutes or so reading the Search Warrant Application and then signed the Search Warrant. (Hr'g Tr. 45; Jun. 20, 2013). After Judge Letts signed the Search Warrant, McCoy and Smith took the Warrant back to the other officers who then affected a forced entry at unit number ten, Maple Ridge Apartments. (Hr'g Tr. 34; Jun. 20, 2013). Upon entering the apartment, offices seized, among other things, thousands of pills, some notebooks, a computer, and drug paraphernalia.

No one was present in the apartment at the time of entry. (Hr'g Tr. 36; Jun. 20, 2013).

## DISCUSSION

Like the detail Magistrate Judge Howell paid to the factual recitation contained in his M&R, his analysis of the legal issues surrounding the stop of the red Mazda driven by Wilson on October 11, 2012, requires little modification from the Court. The Court adopts the majority of Magistrate Judge Howell's reasoning below with some alterations as noted.

I.    **The October 11, 2012, Traffic Stop.**

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV.   Pursuant to the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." United States v. Calandra, 414 U.S. 338, 347 (1974). The temporary detention of an individual by a police officer during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment. United States v. Vaughan, 700 F.3d 705, 709 (4th Cir. 2012); United States v. Digiovanni, 650 F.3d

29

498, 506 (4th Cir. 2011). The decision to initiate a stop of an automobile is reasonable if the police officer has probable cause to believe that a traffic violation has occurred. Digiovanni, 650 F.3d at 506. "Any ulterior motive a police officer may have for making the traffic stop is irrelevant." Id.

Courts employ the standard set forth by the Supreme Court in Terry v. Ohio, 292 U.S. 1 (1968), to determine whether police conduct during routine traffic stops comports with the requirements of the Fourth Amendment. Vaughan, 700 F.3d at 709; United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011). As the Fourth Circuit explained in Guijon-Ortiz:

> Under Terry's "dual inquiry," after asking whether the officer's action was "justified at its inception," Rusher, 966 F.2d at 875, we ask whether the continued stop was "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion). With regard to scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id. With regard to duration, although the reasonable duration of a traffic stop "cannot be stated with mathematical precision," United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008), a stop may become "unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." Illinois v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L.Ed.2d 842 (2005). Thus, we evaluate "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L.Ed.2d 605 (1985). To prolong a traffic stop

"beyond the scope of a routine traffic stop," an officer "must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." Branch, 537 F.3d at 336. This requires "either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." Id.

Although the scope and duration components of Terry's second prong require highly fact-specific inquiries, the cases make possible some generalizations. When a police officer lawfully detains a vehicle, "police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket." United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011). The officer may also, "in the interest of personal safety," request that the passengers in the vehicle provide identification, at least so long as the request does not prolong the seizure. United States v. Soriano–Jarquin, 492 F.3d 495, 500–01 (4th Cir. 2007). Similarly, the officer may "inquir[e] into matters unrelated to the justification for the traffic stop," Arizona v. Johnson, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L.Ed.2d 694 (2009), and may take other actions that do not constitute "searches" within the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle, Caballes, 543 U.S. at 409, 125 S. Ct. 834, but again only "so long as those inquiries [or other actions] do not measurably extend the duration of the stop." Johnson, 129 S. Ct. at 788.

660 F.3d at 764-65.

Here, there is no question that the initial stop of the Mazda was reasonable because Smith had probable cause to believe that Wilson committed a traffic violation by going left of center on three occasions.[11]

_____

[11]The Government argued below that, in addition to Smith seeing Wilson cross the double yellow line three times, the police could have stopped the Mazda on other bases. The Government asserts since David Delly was the only driver listed of record with Hertz for the Mazda, the police would have had reasonable suspicion to stop

Neither Wilson nor Raymond offered any evidence to the contrary. The fact that Smith may have had other motives for stopping the Mazda is irrelevant. <u>Digiovanni</u>, 650 F.3d at 506. Accordingly, the question for the Court is whether the actions taken by the officers after the initial stop complied with the requirements of the Fourth Amendment.

The traffic stop began when Smith and Velez pulled over the Mazda. <u>See</u> <u>id.</u> Smith and Velez requested identification from the driver and the passenger, as well as the car's registration. Velez then promptly returned to his patrol car to run a computer check on the vehicle, check the licenses of the Defendants, and check for outstanding arrest warrants on both Defendants, as he was entitled to do as part of a traffic stop. <u>Vaughan</u>, 700 F.3d at 710; <u>United States v. Soriano-Jarquin</u>, 492 F.3d 495, 500 (4th Cir. 2007). Smith was also entitled to ask both Defendants to exit the vehicle, as he did approximately three minutes into the stop. <u>Vaughan</u>, 700 F.3d at 710. When Defendants exited the vehicles, however, neither Smith nor Velez noticed anything suspicious about them. Moreover, the initial dog-

---

Wilson for "unauthorized use of a motor vehicle or outright larceny." [Doc. 49 at 11]. The Government's argument is flawed for two reasons. First, no law enforcement officer contacted Delly to see if Wilson had his permission to drive the Mazda. <u>See, e.g.,</u> N.C. Gen. Stat. § 14-72.2(a) (a person commits the misdemeanor of unauthorized use of a motor vehicle when she uses a motor vehicle "without the express or implied consent of the owner or person in lawful possession.") Second, an unauthorized driver who operates a rental car, without more, may be liable civilly to the rental company but has committed no crime.

sniff of the vehicle, that lasted under thirty seconds and occurred approximately two minutes into the stop while Velez was having dispatch check for outstanding warrants, did not run afoul of the Fourth Amendment as it did not extend the duration of the stop. Id. However, once the Defendants had exited the vehicle and the detection dog Beck had completed the sniff of the Mazda, the analysis becomes more complicated.

Approximately five minutes into the stop, the computer check of the Defendants was complete. CIPD dispatch confirmed Defendants had no outstanding warrants, and determined Wilson, the driver of the Mazda, held a valid driver's license. Significantly, the officers on the scene were not fearful that Defendants posed any safety risk to them and Smith did not suspect that Wilson was driving under the influence. At this point, the officers had not conducted a pat down of Defendants – they had no basis to conduct a pat down of the Defendants – and no narcotics had yet been discovered. Moreover, no officer was engaged in questioning the Defendants at the time. Ordinarily, during a routine traffic stop, the officer would, at this point, return the driver's license to the operator of the car, write a ticket or issue a warning to the operator, and the stop would come to an end. In fact, Officer Velez testified that once he had completed a

33

computer check of the Defendants' information, he saw no reason to continue to detain them.   (Hr'g Tr. 239; Jun. 12, 2013).

The officers in this case, however, did not return Defendants' documents after the completion of the computer check, did not write Wilson a ticket, and did not allow the Defendants to leave the scene because Cox told Smith that Beck had alerted to the presence of narcotics at the passenger side door of the Mazda.  Instead, the officers began searching the entire vehicle for narcotics.  When Cox told Smith that the dog alerted and Smith thereafter began searching the Mazda for narcotics, the nature of the stop changed from one investigating the reason behind the initial stop – driving left of center – to an investigation into drug trafficking activity. Put another way, the officers abandoned the prosecution of the traffic stop, detained Defendants, and embarked upon a different sustained course of investigation.

Once the officers detained Defendants beyond the scope of the routine traffic stop, the officers needed either the permission of Wilson or reasonable suspicion of illegal activity to prolong the stop.  Digiovanni, 650 F.3d at 507; United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008); United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004).    The reasonable suspicion standard is not as demanding as the probable cause

34

standard and requires a showing that is considerably less than the preponderance of the evidence standard. Foreman, 369 F.3d at 781. "However, the Terry reasonable suspicion standard does require a minimal level of objective justification for the police action." Id. (internal quotation and citation omitted). Reasonable suspicion is an objective test, and courts look to the totality of the circumstances to determine whether the detaining officer had a "particularized and objective basis for suspecting legal wrongdoing." Vaughan, 700 F.3d at 710 (internal citation and quotation omitted).

A reasonable suspicion is demonstrated when an officer is able to "point to 'specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity.' " Branch, 537 F.3d at 336 (quoting Terry, 392 U.S. at 27) (internal citations omitted). When an officer has reasonable suspicion of criminal activity, he may detain the suspect so as "to permit the officer to allay the suspicion." United States v. Mason, 628 F.3d 123, 128 (4th Cir. 2010). United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012).

Here, the officers point to the statement by Cox that Beck alerted to the presence of narcotics on the passenger side door as a basis for

reasonable suspicion of illegal activity. The positive alert from a dog trained to detect narcotics provides officers with reasonable suspicion[12] to believe that narcotics may be present and, thus, that illegal activity may be afoot.[13] See Mason, 628 F.3d at 130; Branch, 537 F.3d at 340, n.2. Defendants, however, challenge the validity of the purported positive alert in this case. Whether a dog alerts is a question of fact for this Court to resolve. Mason, 628 F.3d at 130.

Defendants do not challenge Beck's general reliability, only the determination of whether he alerted. Based on the evidence submitted to the Court during the evidentiary hearing detailing Beck's numerous past alerts signaled by sitting and staring, and after considering the standard set forth by the Supreme Court in Florida v. Harris, 133 S. Ct. 1050 (2013), there is no reason for the Court to doubt that Beck is generally reliable, and that ordinarily an alert from Beck, *explicitly expressed by his trained*

---

[12]Although Mason and Branch address the specific issue of whether there was probable cause to search vehicles for narcotics without a warrant, the legal reasoning of these cases is applicable to this case. If a dog alert provides probable cause to search a vehicle for narcotics without a warrant, then the alert would also provide reasonable suspicion of illegal activity since the standard for reasonable suspicion is a lesser one than probable cause. Foreman, 369 F.3d at 781.

[13]The Court notes that the issue in this case is whether the officers had reasonable suspicion of illegal activity to detain Defendants beyond what was reasonable for a routine traffic stop, not whether the search itself was unlawful. The search of the Mazda, however, revealed no narcotics, and Defendants are not moving to suppress the actual search of the vehicle.

*indication of sitting and staring,* would provide probable cause to search a vehicle or reasonable suspicion to detain the drivers to alleviate concern regarding illegal activity. It is undisputed, however, that Beck did not give his trained indication in this case; Beck did not sit and stare. Instead, Cox testified that he was able to discern that Beck alerted based on Beck's change in behavior at the passenger side door.

At this point, the Court must address some of the terminology that is often used with regard to the behavior and training of detection dogs. An "alert" would ordinarily refer to the specific behavior a dog is trained to do when he encounters the source of the odor he is trained to detect. In the case of Beck, the Court finds that Beck was trained to sit and stare when he found the source of odors emanating from three specific drugs: heroin, cocaine, and marijuana. (Hr'g Tr. 87; Jun. 20, 2013). The record evidence is uncontroverted (and in the video evidence it is obvious) that Beck did not alert in this matter. A detection dog will, in some instances, perform something less than an alert when encountering certain stimuli. This is sometimes referred to as "casting." For instance, in United States v. Rivas, 157 F.3d 364 (5th Cir. 1998), Customs officials at the Brownsville, Texas, Port of Entry led a drug detection dog around the perimeter of what appeared to be an empty auto transport trailer Rivas was hauling with his

37

Kenworth truck. In reality, the trailer held 40 one kilogram bricks of cocaine secreted in its steel frame. According to the Customs officials, the detection dog deployed around Rivas' trailer was trained to indicate actively; the dog would alert by aggressively scratching or attempting to bite at the source of the odor. Id. at 368. The dog, however, did not alert but instead "cast," according to the Customs official. When the official was asked what was meant by the term "cast," he replied, " 'casting' is in a sense the dog maybe feels not a strong alert, but something that temporarily stops him and deters his attention at that point." Id. Casting in Rivas might be somewhat akin to what Cox said he detected as Beck's change in behavior. The Rivas court concluded that a dog's "casting" was too distantly related to an alert to create reasonable suspicion on its own as a matter of law, thus affirming the suppression of the drugs seized from the trailer.

The government argues that the present case is more like that found in United States v. Parada, 577 F.3d 1275 (10th Cir. 2009). In Parada, a Kansas highway patrolman stopped the defendant's van for a traffic violation. Noticing some unusual circumstances, the trooper retrieved his drug dog from his cruiser and walked the dog around defendant's van. Even though the trooper's dog was an active alert dog, the trooper stated

38

his dog "alerted" to the driver's side of the van by "stiffening his body, breathing deeply, and attempting to jump into the window."  Id., 577 F.3d at 1281.  The trooper went on to explain his understanding of an alert versus an indication:

> Followed up by an alert is an indication. The indication is a conclusion of the search where the dog through its physical characteristics and natural abilities pinpoints that exact location of where the odor is coming from.... [T]he way that Rico indicates is basically done through scratching, biting, barking, any number of things.

Id.  Based on this explanation, the Parada court followed the Tenth Circuit's general rule that "a dog's alert to the presence of contraband is sufficient to provide probable cause.  We decline to adopt the stricter rule urged by Mr. Parada, which would require the dog to give a final indication before probable cause is established."   Id., 577 F.3d at 1282.  Using these terms somewhat more loosely, the Tenth Circuit determined that a "casting" (what it called an "alert") was sufficient to provide probable cause, even in the absence of a true alert (which it called a "final indication").

The Government in this case argues that Beck's change of behavior, whether denominated a "casting" or an "alert," was sufficient to warrant detaining the Defendants.  The problem with the Government's argument is that it is not supported by the evidence.  The Court finds that, after a review of the evidence in the record, including the video of Beck's sniff of the

39

Defendants' car, Beck did not in fact alert to the presence of narcotics in this case because, at no time, did Beck sit and stare. Moreover, Beck neither alerted nor cast to the presence of narcotics. In short, the Court adopts the Magistrate Judge's recommended findings that the testimony of Cox, in nearly all material respects, was not credible. The Magistrate Judge found Cox's testimony credible in that he said Beck had not been trained to detect oxycodone. Therefore, Beck could not have alerted to the pills that the Defendants were concealing. [Doc. 82 at 35]. The Court also finds the testimony of the expert witness, Deputy Blackwell, to be completely credible, especially on the issue that a dog's "change in behavior" cannot be equated to an "alert." Given the credible record evidence the Court finds that Defendants were not suspected of trafficking any drug other than oxycodone; Beck was not trained to recognize the odor of oxycodone; a dog trained to alert to the odor of heroin will not alert to the odor of oxycodone; Beck appeared more interested in Smith's shoes than he did in the Mazda; Beck never gave his trained indication of sitting and staring; no drugs of any kind were found in the Mazda upon searching it; and the CIPD neither sought to consult its own detection dog handlers nor those in the nearest neighboring county before contacting Cox. These findings all lead the Court to the ineluctable and troubling conclusion that a drug dog alert

40

did not occur in this case. In fact, the Court concludes that there is no credible evidence that any dog alert, or even a dog cast, occurred in this instance.

Because of the Court's findings herein, the Court need not address the open question in this Circuit regarding the proper "alert" standard for detection dogs – the standard adopted by the Fifth Circuit in <u>Rivas</u> or the less stringent one adopted by the Tenth Circuit in <u>Parada</u>. The Court notes that with law enforcement's use of detection dogs, the dog becomes the functional equivalent of the magistrate. Since a magistrate's warrant must set forth the objective basis informing the probable cause determination, it is "reasonable" (in the Fourth Amendment sense) to demand no less than the same clarity from a magistrate's proxy. As was cogently stated by the expert witness Blackwell during the suppression hearing, "Like I said I want a solid sit and stare. Like I said I feel these dogs are a blank signed search warrant and I want something strong." (Hr'g Tr. 344; Jun. 20, 2013). Even though some lesser, yet objectively definitive, indication by a dog may be sufficient to fulfill this standard under some circumstances, there is no evidence of any such indication here.

A court cannot accept a handler's subjective determination that a dog has made some otherwise undetectable alert, which conclusion would be,

for all practical purposes, immune from review. Given the nature of the constitutional right at issue, the Supreme Court has found this premise to be unacceptable. "If [an officer's] subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." Beck v. Ohio, 379 U.S. 89, 97 (1964). To allow a search predicated upon an officer's interpretation of the utterly minimalist lesser showing exhibited by the dog in this case would be tantamount to permitting law enforcement officers to issue their own search warrants based upon their own subjective analysis, something the Framers explicitly prohibited.

Having found that Beck did not alert in this case, the Government cannot rely on Cox's subjective feeling that the dog had given some sort of otherwise indiscernible alert or cast to constitute reasonable suspicion of criminal activity to warrant detaining Defendants beyond what was necessary to complete the traffic stop. Absent a more definitive alert, there was no reasonable suspicion of criminal activity prior to the time when the traffic stop should have ended. The officers did not question Defendants about where they were going, did not ask who had rented the red Mazda, did not ask if they had permission of the named driver to

42

operate the vehicle, and did not ask if drugs were present in the car. Moreover, the officers testified that Defendants were cooperative, were not sweating excessively, and were not acting suspicious, threatening, or aggressive. In fact, aside from asking for Defendants' identification, the officers did not ask Defendants <u>any</u> questions until shortly before they began bodily searching them. Aside from some general information they received that led to the initial surveillance of the Mazda, the officers had no reason, apart from the purported alert by Beck, to justify prolonging the stop. Even one of the two officers who initiated the stop recognized this fact. Officer Velez testified that once he had completed a computer check of the Defendants' information, he saw no reason to continue to detain them. (Hr'g Tr. 239; Jun. 12, 2013). The purported alert by Beck is the lynchpin, and once it is removed there is no justification for the subsequent actions taken by the officers.

In contrast to the Government's contention to the contrary, the fact that Defendant Wilson broke her cell phone when Smith told her to refrain from using it did not provide reasonable suspicion of criminal activity.[14] At

---

[14]Although not dispositive of any issue in the case, the Court finds that Smith's testimony that he ordered Defendants out of the car because Wilson broke her phone, as opposed to the fact that Cox had just told him that Beck had alerted to the presence of narcotics on the passenger side door, not to be credible.

most, Wilson became agitated when Smith told her for the second time to refrain from using the phone. She broke her flip phone in what fairly could be understood as a frustrated effort to demonstrate to Smith that she would not use the phone again. Defendant Wilson was neither using the phone in a threatening manner nor exhibiting any other suspicious behavior. After Wilson broke her phone, Smith did not inquire as to why she broke the phone or ask her any questions about the incident.

The fact that Defendants were traveling in a rental vehicle does not dictate a different result. The officers knew prior to the stop that the red Mazda was a Hertz car rented by David Delly. Hertz had also informed the officers that Wilson was not an authorized driver of the vehicle and requested that the officers not release the car to her. Thus, no additional time was needed for the officers on the scene to contact Hertz during the stop and determine whether Wilson was an authorized driver as far as Hertz was concerned. The Government argues that the officers could have impounded the car at that point, or left it by the side of the road and notified Hertz of its location, but this did not give the officers grounds to detain Defendants further. Even if Defendants' operation of the vehicle may have constituted a breach of the rental agreement between Delly and Hertz, the officers did not have reasonable suspicion that the Defendants were

44

operating the rental car in violation of North Carolina law.[15] None of the officers inquired as to whether Wilson had the authorization of Delly to operate the vehicle. In fact, the officers state they had reason to believe (through their informants) that Delly *had intentionally provided* Wilson with the rental vehicle for her use. There was certainly no evidence that the officers believed the red Mazda to be stolen.

After being pulled over, Wilson provided Velez with the rental agreement showing that David Delly had rented the vehicle. Although the officers could have asked the Defendants questions regarding the rental agreement, the identity of Delly, whether Delly had given them permission to operate the vehicle, why Delly was allowing them use the car, where Delly was at the time, or any number of questions related to the rental vehicle, they did not do so. They never inquired into the rental of the car or the rental agreement. Instead, the officers detained Defendants based entirely on the dog alert that the Court finds did not occur at all.

Based on the totality of circumstances, the Court finds that the Government has failed to demonstrate reasonable suspicion to detain Defendants beyond the scope necessary to effectuate the traffic stop for Wilson's driving left of center.

---

[15] See note 11, supra.

## II.     The *Terry* Frisk Following the October 11, 2012, Traffic Stop.

An officer engaged in a traffic stop may conduct a pat-down of the driver or passenger for weapons where the officer has the reasonable suspicion that the individual is armed and presently dangerous. Minnesota v. Dickerson, 508 U.S. 366, 373 (1993); United States v. Powell, 666 F.3d 180, 184 (4th Cir. 2011); United States v. Hernandez-Mendez, 626 F.3d 203, 211 (4th Cir. 2010). "Reasonable suspicion is a particularized and objective basis for suspecting that the person to be frisked is armed and dangerous." Powell, 666 F.3d at 185-86. "If a Terry frisk exceeds the bounds of a protective pat down for weapons, it is no longer permissible, and its fruits should be suppressed." Hernandez-Mendez, 626 F.3d 203. The Government bears the burden of establishing reasonable suspicion. Powell, 666 F.3d at 186.

As an initial matter, the Terry frisk in this case occurred while Defendants were detained without reasonable suspicion of criminal activity. Although Smith ordered the Defendants out of the red Mazda within approximately three minutes of initiating the traffic stop, the officers did not conduct a pat down for weapons at that time. Instead, the pat down occurred after Velez received confirmation from dispatch that Defendant Wilson had a valid license and there were no outstanding warrants for

46

either Defendant. The Court has already determine that the dog did not alert, and that without the dog alert the officers lacked reasonable suspicion of criminal activity to continue to detain Defendants. Therefore, Defendants should have been released and told they were free to go prior to when the Terry frisk occurred, irrespective of whether the officers had any basis to hold the vehicle for Hertz.

The Government argues that the officers who stopped the Defendants' car were polite in not frisking the Defendants immediately upon approaching the car but, instead, waited until a female officer arrived:

> In retrospect law enforcement arguably will conclude they should have been less conscientious — had the male officers on scene not run a dog around the rental car and instead simply ordered the defendants out and immediately conducted a thorough Terry frisk for weapons, they very likely would have detected the bulges in the clothing of each defendant and this entire argument would be moot.

[Doc. 87 at 6-7 (footnote omitted)]. The Government erroneously conflates the reasonable suspicion necessary to initiate a traffic stop with the reasonable suspicion necessary to conduct a Terry frisk. That Smith had reasonable suspicion to believe Wilson improperly crossed the double yellow center line while driving the Mazda does not, ipso facto, supply reasonable suspicion that she or Raymond was armed and dangerous and posed a present threat to the officers. Putting aside all together the issue

Case 2:13-cr-00002-MR-DLH   Document 94   Filed 01/21/14   Page 47 of 83

of whether the dog had alerted, the Government failed to meet its burden of demonstrating that the officers had a reasonable suspicion that either Defendant was armed and presently dangerous to warrant a frisk.

First, the testimony of the officers themselves contradicts the notion that they had reasonable suspicion to believe that Defendants were armed. Defendants were cooperative, they kept their hands where Smith could see them, they did not reach to an area of their body or the car where a gun might be hidden, they did not appear nervous, and Smith did not notice anything suspicious when the Defendants exited the vehicle. Detective Smith himself testified that he did <u>not</u> suspect that Defendants were armed. Even more telling is the fact that the officer who actually performed the pat down of the Defendants, Sgt. Carla Neadau, testified that she had no reasonable suspicion that either Defendant was armed at the time of the frisk.

Second, the fact that the officers on the scene saw no need to pat down either Defendant immediately after they were removed from the car belies any reasonable suspicion that either Defendant was armed. Even the officer who called Neadau to the scene to perform the pat down testified that he was not concerned enough about whether Wilson had a weapon in order to pat her down himself during the approximately twenty

48

minutes that he stood near her.  If the officers had a reasonable suspicion that Defendants were armed and dangerous and that their safety might be at risk, addressing that risk would have been the very first task undertaken by the officers.  The officers, however, were not fearful, and their actions, pursued in conformity with their beliefs that the Mazda held the drugs they sought, serve to illustrate that their main objective was finding any basis to search the car.

Third, Velez had a prior encounter with Wilson when he pulled her over on September 12, 2012.  Because Velez knew the identity of Wilson, the conduct of Wilson from this prior encounter would have lessened any concern Velez may have had that Wilson might be armed and dangerous.

Considering the totality of the circumstances, the Court finds that the Government has failed to demonstrate that the officers had reasonable suspicion to believe that either Defendant was armed and dangerous such as to justify a Terry frisk.   Because the pat down of Defendant Raymond was not consensual and was not based on a reasonable belief that she was armed and dangerous, the search violated her Fourth Amendment rights, and the evidence that was ultimately found as a result of the pat down must be suppressed.  Finally, absent the discovery of the pills on Raymond, there was no basis to arrest Defendants and take them into

49

custody where jail personnel found the pills Wilson had hidden on her person.   Accordingly, the Court will grant the Defendants' motions to suppress the pills found during the search of Defendants' persons.

## III.   **The Search Warrant**.

Before the Court begins its analysis of this last issue, it pauses to address an increasingly common problem it experiences with matters initially handled by the Magistrate Judges:  the parties' inadequate briefing done before the Magistrate Judges.   This matter can serve as a prime example.  As will be seen below, the Court ultimately rejects the Magistrate Judge's recommendation not to suppress the evidence found in the Defendants' apartment.   The Court does so not because it disagrees with the Magistrate Judge's analysis set forth in his M&R, as far as it goes.   It does so because the parties failed to brief, in any meaningful way, the proper method of parsing through the language of a search warrant application which, in turn, would have allowed the Magistrate Judge to consider this issue when conducting his analysis *before* reaching the good faith exception announced in United States v. Leon, 468 U.S. 897 (1984). The Defendants devoted only two sentences in their brief to the Magistrate Judge on whether the proper information contained in the Application was

50

sufficient to support a valid search warrant. [Doc. 39 at 24].   This is hardly adequate.

This Court is very much aware of precedent that requires it to consider all arguments directed at an issue regardless of whether such arguments were raised before the Magistrate Judge in the first instance. United States v. George, 971 F.2d 1113, 1118 (1992) (de novo review requires the district court to consider any argument that could have been raised before the magistrate judge, whether or not so raised or how well explained).  On the other hand, "Judges [including Magistrate Judges] are not like pigs, hunting for truffles buried in briefs." Teague v. Bakker, 35 F.3d 978, 985 n.5 (4th Cir. 1994), cert. denied, 513 U.S. 1153 (1995) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).  Just because retaining an argument until the filing of an objection to an M&R is permissible, that does not mean it is a good idea.  The better practice, of course, is for counsel clearly to articulate, as soon as possible in their filed written memoranda, the relief requested and the grounds therefor, including citations to relevant law.   With that said, the Court will address the sufficiency of the Search Warrant Application and whether it provided Judge Letts an objective basis to conclude probable cause existed to search Defendants' apartment.

51

The Fourth Amendment secures the right of the people to be secure in their "persons, houses, papers, and effects, against unreasonable searches and seizures, ... and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV.   The Defendants assert that the Search Warrant issued in this matter was not supported by sufficient facts establishing probable cause, especially when the evidence unconstitutionally obtained following the dog's purported alert is excluded.  [Doc. 39 at 24].  The Court will analyze the Search Warrant Application and will address what effect any suppressed, erroneous, misleading, or unsubstantiated facts, if any, bear on the ultimate validity of the Search Warrant issued.

## A.    Excising Tainted Information from the Warrant Application.

In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court held that affidavits in support of a search warrant could be challenged for their veracity by a complainant seeking a hearing in the district court upon a proper showing. 438 U.S. at 165. "[I]f these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."  Id. at 171-2

52

(footnote omitted). Flowing directly from the holding in <u>Franks</u>, therefore, is the proposition that when a search warrant application sets forth statements later determined to be false or made with reckless disregard for the truth, the tainted material should be excised and the warrant application reviewed without it to see if the remaining facts establish probable cause.

Following the <u>Franks</u> decision, the Fourth Circuit held this same remedy applies in circumstances when evidence included within a warrant application is later held to be the product of an unconstitutional search, <u>United States v. Gillenwaters</u>, 890 F.2d 679, 682 (4th Cir. 1989), and when information contained in the warrant application was arguably "stale" or too old to furnish "present" probable cause, <u>United States v. McCall</u>, 740 F.2d 1331, 1336 (4th Cir. 1984).

Turning to the Search Warrant Application in this case, <u>Gillenwaters</u> dictates that the Court set aside those portions of the Application that stem from the purported dog alert and subsequent seizure of the drugs. These consist of the last paragraph appearing on page five of the Application, [Doc. 49-1 at 7, ¶4], and the word "more" from the first sentence, as well as the entire last sentence, of the concluding paragraph appearing on page 6 of the Application. [Doc. 49-1 at 8, ¶2]. Were the Court able to stop its analysis at this point, it may well have agreed with the Magistrate Judge

53

that the remaining assertions in the Application were sufficient to support the Warrant. The Defendants, however, raise for the first time in their objections to the M&R that the Court should examine the Application further. [Doc. 85 at 5-10; Doc. 86]. Notwithstanding the Defendants' failure to raise this earlier, the Court is obliged to address the Defendants' new issues.

### B. Analyzing Tipster and Informant Statements, as well as False Information Included in the Application.

To establish probable cause for the issuance of a search warrant, "the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Conclusory statements, even from "reliable informants," however, are not enough to establish probable cause. 462 U.S. at 239. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Id. The warrant affidavit must contain enough facts and circumstances for the magistrate also to conclude that there is probable cause that contraband will be present in the

54

identified location.  Id.  This Court's obligation, in reviewing the Search Warrant, is to determine if a substantial basis exists for the finding of probable cause.  Id.

In this case, there were three civilians, excluding the manager of the apartment complex where Defendants stayed, who supplied information appearing in the Search Warrant Application.  These individuals were:  the "anonymous tipster" who provided information in paragraph 2 of page 4 of the Application [Doc. 49-1 at 6, ¶2]; Justina Rattler who provided information in paragraph 4 of page 4 of the Application [Doc. 49-1 at 6, ¶4]; and the "Confidential Source" who provided information in paragraph 6 of page 4 and continuing on to page 5 of the Application [Doc. 49-1 at 6-7, ¶6].  These three persons either provided information directly to Smith, Stites, or Shiver, or they provided their information to other law enforcement officers who in turn related such information to Smith, Stites, or Shiver.  Smith, Stites, and Shiver ultimately collaborated with McCoy during the drafting of the Search Warrant Application and determined what information would be included within the Application.  The Court will address each of these civilian sources in turn, beginning with the anonymous tipster.  Because there is no dispute that the drafting of the Search Warrant Application was a joint effort among Smith, Stites, Shiver,

55

and McCoy but that McCoy, the least knowledgeable of the four, was the only signatory to the Application, the Court will impute the collective knowledge of Smith, Stites, Shiver, and their colleagues to McCoy.[16]

Applying  Gates, the Fourth Circuit has held that "[a]n informant's tip is rarely adequate on its own to support a finding of probable cause." United States v. Miller, 925 F.2d 695, 698 (4th Cir.), cert. denied, 502 U.S. 833 (1991).  The Search Warrant Application, page 4, paragraph 2, states:

> On September 18, 2012, Cherokee Indian Police Detective Matthew Shiver received an anonymous tip that a black female was an oxycodone source of supply for Kandace GRIFFIN. The tipster advised the black female was currently at GRIFFIN'S residence, located at 404 Rock Hill Church Road, Cherokee, North Carolina.

[Doc. 49-1 at 6, ¶2].

In this case, however, the anonymous tipster was not anonymous. When pressed by Magistrate Judge Howell, Shiver eventually testified that he did, in fact, know the person listed as the tipster in Application page 4, paragraph 2.  The Court is thus confronted with the first false statement by law enforcement intentionally included in the Application.  Instead of McCoy

---

[16]See, e.g., Leon, 468 U.S. at 923 n.24. "It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination. Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a 'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search."

including the falsehood, Shiver should have directed McCoy to write that "Shiver received information from a person known to him but who wished to remain nameless who told him…" Doing so, however, may have drawn greater scrutiny to this information by the reviewing judicial officer and prompted questions like, why does this person not want his/her name mentioned? How does Shiver know this person?  How long has Shiver known this person?  Is this person reliable?  Did this person provide Shiver the information in a face-to-face meeting?[17] What basis of knowledge does this person have to know that a black female supplies Kandace Griffin with oxycodone? How does this person know what oxycodone is?  How long ago did this person see the black female supply Kandace Griffin with oxycodone?  Where did this person see the black female supply Kandace Griffin with oxycodone? How does this person know that the black female, who allegedly supplies Kandace Griffin with oxycodone, was at Griffin's house at the time s/he called Shiver?   This last question, if answered in a way that law enforcement could have corroborated, would have been the most important.  "One important factor in determining whether an

---

[17]Unlike an anonymous tipster, "an informant who meets face-to-face with an officer provides the officer with an opportunity to assess his credibility and demeanor and also exposes himself to accountability for making a false statement." United States v. DeQuasie, 373 F.3d  509, 523 (4th Cir. 2004).

informant's tip has established probable cause is the degree to which the arresting officer can corroborate that tip." Miller, 925 F.2d at 698.

The Court must disregard paragraph 2 of Application page 4 for two reasons. First, while McCoy was sworn to tell the truth in the Application, he adopted, and thereafter represented as true, a concededly false statement concerning the nature of the person supplying the information. "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." Franks, 438 U.S. at 164-6, citing with approval, United States v. Halsey, 257 F.Supp. 1002, 1005 (S.D.N.Y. 1966). Second, as required by Miller, the police did nothing to corroborate the facts conveyed by the tipster that, on the day of the tipster's call, a black female who supplies drugs to Griffin was at Griffin's house. At most, the police observed what they later learned was a rental car parked at Griffin's house but saw nothing more. For these reasons, the Court must disregard paragraph 2 of Application page 4.

Search Warrant Application page 4, paragraph 4, is much more troubling to the Court. It avers:

> On the same date, Sgt. Daryl Martin, spoke with Justina RATTLER. RATTLER identified the black female as Eudine WILSON. RATTLER informed Sgt. Martin that WILSON was an 30 mg oxycodone source of supply for Kandace GRIFFIN.

58

RATTLER advised that WILSON had previously been an oxycodone source of supply for herself. RATTLER advised WILSON brings two hundred (200) 30 mg oxycodone tablets every couple of days to Kandace GRIFFIN. RATTLER advised WILSON will keep the oxycodone tablets in her apartment and as much as $10,000 in United States currency. RATTLER advised WILSON is from Florida and has an apartment approximately ten minutes from the GRIFFIN residence.

[Doc. 49-1 at 6, ¶4]. This paragraph is of concern because it sets forth an admittedly false factual statement - that Rattler identified the black female as Defendant Eudine Wilson. While the reviewing magistrate may well have made the vital inference that Baby D and Defendant Eudine Wilson are the same person, it was incumbent upon law enforcement to provide the magistrate with accurate information it actually possessed at the time. The affiant cannot pre-empt the magistrate's judgment by presenting false information just because he assumes the magistrate will make such findings.

Looking first at the untruthfulness issue,[18] the second sentence of paragraph 4 is abjectly false. Justina Rattler did not identify the black female as Eudine Wilson. According to Sgt. Martin, Rattler identified the black female only as Baby D because Rattler did not know her true name. (Hr'g Tr. 19; Jun. 12, 2013). If the Court were simply to substitute the

---

[18] The Defendants' presentation of this issue is, at best, oblique. [Doc. 85 at 9-10]. The Court finds, however, that it is sufficient (barely) to preserve the issue.

name "Baby D" for the references in the Application to Eudine Wilson or Wilson, the significance of the untruthful statement becomes readily apparent:

> On the same date, Sgt. Daryl Martin, spoke with Justina RATTLER. RATTLER identified the black female as ["BABY D."] RATTLER informed Sgt. Martin that [BABY D] was an 30 mg oxycodone source of supply for Kandace GRIFFIN. RATTLER advised that [BABY D] had previously been an oxycodone source of supply for herself. RATTLER advised [BABY D] brings two hundred (200) 30 mg oxycodone tablets every couple of days to Kandace GRIFFIN. RATTLER advised [BABY D] will keep the oxycodone tablets in her apartment and as much as $10,000 in United States currency. RATTLER advised [BABY D] is from Florida and has an apartment approximately ten minutes from the GRIFFIN residence.

Nowhere else in the Application is Baby D mentioned nor, more importantly, does the affiant explain how law enforcement came upon the facts that led them to believe Baby D was Eudine Wilson.   This is not to say that Smith, Stites, and Shiver, through McCoy, could not show their work – their Internet search under Wilson's name leading them to her Facebook page and her similar nickname – which would have permitted Judge Letts thereafter to connect the dots for himself.  To the contrary, law enforcement had available *at the time the Application was prepared* the complete set of facts and circumstances that would have likely permitted Judge Letts to draw the conclusion the officers sought.   They did not, however, provide him with the information to do it. In fact, they did not

60

provide him with any information regarding "Baby D." Instead, they short-circuited Judge Letts' duty and responsibility by attributing to Rattler a statement that she simply did not make. The Supreme Court's teaching on this point bears repeating:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

Johnson v. United States, 333 U.S. 10, 13-4 (1948). Accordingly, under the dictates of Franks, the Court must strike the references to Wilson in paragraph 4 on page 4 of the Application.[19] Further, the Court cannot substitute the name Baby D for Wilson when reviewing the Application for probable cause because this would be inserting information into the Application to which Judge Letts was not privy.

> Our review of whether the search warrant was supported by probable cause - in other words, a review of the facts upon which the issuing magistrate relied - may not go beyond the information actually presented to the magistrate during the warrant application process. See Whiteley v. Warden, 401 U.S. 560, 565 n.8, 91 S. Ct. 1031, 28 L.Ed.2d 306 (1971) ("[A]n

---

[19]It is for this same reason – the officers' usurpation of Judge Letts' role – that the Court also must strike the name "Eddie" appearing in the last sentence of the third paragraph on Application page 4 [Doc. 49-1 at 6, ¶3], and the parenthetical phrase "(believed by agents to be David DELLY)" in the first paragraph on Application page 6 [Doc. 49-1 at 8, ¶1].

61

otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate.... A contrary rule would ... render the warrant requirements of the Fourth Amendment meaningless.").

Owens v. Lott, 372 F.3d 267, 277-8 (4th Cir. 2004), cert. denied sub nom, Donaldson v. Lott, 543 U.S. 1050 (2005). See also, United States v. Martinez–Fuerte, 428 U.S. 543, 565 (1976) (noting that a purpose of the Fourth Amendment is to "prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure"). Finally, even though a "magistrate may consider sworn, unrecorded oral testimony in making probable cause determinations during warrant proceedings[,]" United States v. Clyburn, 24 F.3d 613, 617 (4th Cir. 1994), McCoy testified that Smith did not verbally relate to Judge Letts any information beyond what was already included in the Search Warrant Application. (Hr'g Tr. 43; Jun. 20, 2013). In accord, United States v. Perez, 393 F.3d 457, 462 (4th Cir. 2004). For these reasons, the Court must disregard paragraph 4 on page 4 of the Application.

The last paragraph on page 4 of the Application which continues on to page 5 of the Application fails under Gates for insufficient background information. That paragraph, as submitted to Judge Letts, states:

On September 20, 2012, Cherokee Indian Police Department Detectives Matthew Shiver and Jeff Smith spoke with Cherokee Indian Police Department Confidential Source #09201201 hereafter referred to as CS. The CS advised Kandace GRIFFIN owes a male subject from Florida named Mr. Ed, eight thousand dollars ($8000.00). The CS advised Mr. Ed hires elderly people to doctor shop to obtain oxycodone. The CS advised Mr. Ed would bring oxycodone to Kandace GRIFFIN. The CS advised Mr. Ed would send two (2) black females to sell the pills along with two (2) black males for protection. The CS advised the two black females would deliver the oxycodone to GRIFFIN. The CS advised the black females were driving a black Mazda car, which was located at the Maple Ridge Apartments. The CS advised the two black females would go the GRIFFIN residence and the two black males would stay at the apartment with the remaining oxycodone.

[Doc. 49-1 at 6-7].

While the Supreme Court in <u>Gates</u> relaxed the factual requirements incumbent upon the police to show that their informants are reliable and possessed with a basis of knowledge to support their allegations, the Court did not abandon those requirements outright.

Our original phrasing of the so-called "two-pronged test" in <u>Aguilar v. Texas</u>, 378 U.S. 108, 84 S. Ct. 1509, 12 L.Ed. 2d 723 (1969), suggests that the two prongs were intended simply as guides to a magistrate's determination of probable cause, not as inflexible, independent requirements applicable in every case. In <u>Aguilar</u>, we required only that:

the magistrate must be informed of *some of the underlying circumstances* from which the informant concluded that ... narcotics were where he claimed they were, and *some of the underlying circumstances* from which the officer concluded that the informant ... was 'credible' or his information

63

> 'reliable.' " <u>Id.</u>, at 114, 84 S. Ct., at 1514 (emphasis
> added).

<u>Gates</u>, 462 U.S. at 230 n.6.  In this case, the officers made no showing on either point in the Application.  Thus, Judge Letts had no facts to substantiate that the CS was a truthful person, or that s/he had been in a position to have knowledge of the substance of what s/he reported to the officers.

To begin, the Application sets forth no facts regarding the CS's reliability, truthfulness, or past work experience with the CIPD.  Again, the error here was not the absence of such evidence but the officers' failure to communicate the CS's work history with CIPD to Judge Letts in the Application[20] in order to permit the judge independently to draw these critical credibility inferences. To be sure, even though Shiver admitted having never used this CS in the past and, therefore, having no first-hand knowledge concerning the CS's reliability, (Hr.'g Tr. 226; Jun. 20, 2013), Sneed told Shiver this CS had been reliable and honest with him in the past.  (Hr.'g Tr. 226, 274, 286; Jun. 20, 2013).  While this conclusory background data on the CS was demonstrably thin, the CIPD also

_____

[20]Fourth Circuit examples of legally sufficient confidential informant background detail in search warrant applications, and the law enforcement corroboration of that detail, can be found in <u>United States v. Blackwood</u>, 913 F.2d 139, 140-41 (4th Cir. 1990); <u>United States v. Chavez</u>, 902 F.2d 259, 261 (4th Cir. 1990); and <u>United States v. Shepherd</u>, 714 F.2d 316, 317 (4th Cir. 1983), <u>cert</u>. <u>denied</u>, 466 U.S. 938 (1984).

64

possessed some additional information from another informant (the "September 13 informant" discussed <u>supra</u> at 10) that corroborated at least some parts[21] of what the CS told Smith and Shiver. None of this intelligence, however, was set forth in the Application nor was it explained to Judge Letts verbally during the Search Warrant procurement process. Where a confidential source's information bears no corroboration, the confidential source is more akin to an anonymous tipster. There must then be something within the source's information that can verify its reliability.

Like the absence of any evidence regarding the past reliability of the CS, the Application sets forth no facts explaining how the CS came to know all of the information s/he provided to Smith and Shiver. With regard to the lesser standard of reasonable suspicion, the Supreme Court noted "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." <u>Florida v. J.L.</u>, 529 U.S. 266, 270 (2000) (citation omitted). Chief among these situations is that the tipster's information contain "a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." <u>Alabama v. White</u>, 496 U.S. 325, 332

---

[21]The September 13 informant said he had purchased oxycodone at Griffin's house and the person bringing the drugs was a black female who drove an SUV with Texas tags.

(1990). In essence, the future predictability of information given by an anonymous tipster can establish her reliability, whereas the documented past performance of a confidential source establishes his. Therefore, what was important to the Court in <u>White</u> "was the caller's ability to predict respondent's *future behavior,* because it demonstrated inside information—a special familiarity with respondent's affairs. The general public would have had no way of knowing [this detailed, personal information]." <u>Id.</u>

In this case, the CS's information given to Smith and Shiver simply related only historical information. In addition, nothing asserted in this paragraph or anywhere else in the Application disclosed any facts that would impart a sense of urgency. The police had no reason to forego an independent investigation[22] of the CS's historical statements concerning "Mr. Ed" or his alleged nefarious drug acquisition scheme in Florida. Further, unlike the anonymous letter at issue in <u>Gates</u> or the anonymous call at issue in <u>White</u>, the CS here did not provide <u>any</u> predictive information the officers could have corroborated by future observations. The only verifiable facts related by the CS were that two black females drove a black Mazda vehicle located at the Maple Ridge Apartments –

---

[22]The officers in the instant case, with regard to the parts of the information the CS provided about "Mr. Ed," his purported activities in Florida, and the alleged debt owed to him by Griffin, failed to perform "the kind of independent police work that can lend probative value to otherwise vague information." <u>Blackwood</u>, 913 F.2d at 142.

wholly innocent past facts any person could have observed and reported without regard to future events.  As observed by the Supreme Court:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

J.L., 529 U.S. at  272.

On these findings, and based upon the teachings of Gates, White, and J.L., described above, the paragraph must be set aside.  There were absolutely no facts put before Judge Letts in the Application to substantiate whether the CS was a truthful person or whether s/he had been in a position to observe anything that s/he reported to Smith and Shiver.  To paraphrase the Supreme Court, "[a]ll  [Judge Letts] had to go on … was the bare report of an unknown, unaccountable informant who neither explained how he knew about the [drugs] nor supplied any basis for believing he had inside information about [Defendants]. If White was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line." J.L., 529 U.S. at  271.

At the end of the day, following the parsing of the Application dictated by binding precedent, the Application reviewed by Judge Letts is reduced to the following:

On October 11, 2012, this Applicant was contacted by TFO Billy Stites, who is currently assigned to the Drug Enforcement Administration Task Force out of Asheville, North Carolina. TFO Stites stated that he is currently working on a Federal investigation concerning the possession and distribution of large quantities of controlled substances specifically oxycodone within Western North Carolina. TFO Stites provided the following information.

On the same date, Cherokee Indian Police Department Sgt. Daryl Martin drove by the GRIFFIN residence and observed a black Mazda 6, sitting in the drive way bearing New York license plate # FCT1298, registered to Hertz Rental Car. This information was relayed to DEA TFO Courtney Mumm. TFO Mumm served Hertz Rental Car with a subpoena requesting the renter's information. Hertz Rental Car identified David DELLY as the current renter of the vehicle. TFO Mumm and TFO Stites learned that the Asheville, NC Municipal Airport Police had encountered DELLY in February 2012 and seized approximately $35,000 in United States currency believed to be drug proceeds. Airport Police deployed a narcotics K-9 which alerted to the presence of controlled substance on the currency.

On September 19, 2012, Cherokee Indian Police Department Detective Jeff Smith located the vehicle bearing New York license plate# FCT1298 sitting in the parking lot of the Maple Ridge Apartments located at 2348 US Highway 441 North, Whittier. North Carolina. Cherokee Indian Police Department Officer David Velez and Lieutenant Glenn Welch located the vehicle after leaving the apartments and conducted a traffic stop on the vehicle for the driver failing to wear a safety belt. Officer Velez and Lt. Welch identified the driver as Eudine Trenae WILSON. Lt. Welch confirmed the vehicle was

68

registered to David DELLY through Hertz Rental Car. WILSON was released without incident.

On October 11, 2012, Cherokee Indian Police Department Detective Jeff Smith located a 2012 Red Mazda 6 bearing Louisiana license plate # N306169, registered to Hertz Rental Car. This information was relayed to TFO Billy Stites. TFO Stites served Hertz Rental Car with a subpoena requesting the renter's information. Hertz Rental Car identified David DELLY as the current renter of the vehicle.

On the same date, Agents established surveillance on the Maple Ridge Apartments, room #10 located at 2348 US Highway 441 North, Whittier, Jackson County, North Carolina. Swain County Sheriff s Office Detective William Reed observed the female he knew to be Eudine WILSON and an unknown black female exit room #10 at the Maple Ridge Apartments. The unknown female was later identified as Marie Luzinski RAYMOND. Detective Reed observed WILSON and RAYMOND leave the apartments driving the red Mazda 6 bearing Louisiana license plate #N306169. Detective Jeff Smith located the vehicle and observed the vehicle cross left of the center solid double yellow lines in violation of North Carolina law and the Cherokee Tribal code. WILSON and RAYMOND were observed by officers from the time they left room #10 until they were stopped by Detective Jeff Smith.

Jackson County Sheriffs Office Detective Patrick McCoy contacted Liz Broome who is the manager for the Maple Ridge Apartments. Mrs. Broome stated that an Eddie Delly rented that apartment but that his girlfriend Marie RAYMOND has been paying the rent for the last couple of months and that she has hardly seen anyone at the apartment since it has been rented.

**Conclusion**

Due to this applicant's training and experience it is very probable that there are controlled substances in apartment # 10 of the Maple Ridge Apartments along with other evidence pertaining to this investigation. This applicant knows that

69

generally a person who is selling drugs will not carry or transport all of the drugs that they possess with them in fear that if they get caught they will be charged with more serious crimes and also face longer sentences.

In considering the totality of the circumstances set forth in these appropriate portions of the Application, Gates, 462 U.S. at 230, the Court finds that an issuing judge could have no basis for concluding that probable cause existed to search the apartment listed. United States v. Richardson, 607 F.3d 357, 369 (4th Cir. 2010), The Court finds that the redacted Application provided no probable cause to conclude that a search of Maple Ridge Apartment #10 would lead to the discovery of the controlled substance oxycodone or any controlled substances at all. The question next to be addressed, therefore, is whether the Supreme Court's Leon decision provides the Court any legal basis to salvage the Search Warrant executed by the officers on October 11, 2012.

## C.  No Good Faith Basis Exists to Save the Warrant.

The Magistrate Judge was not asked to analyze the Application except as it pertains to the dog alert. As a result, he recommended that this Court find that the officers' reliance on the Search Warrant was objectively reasonable. [Doc. 82 at 44]. The Magistrate Judge, therefore, recommended that this Court conclude that the good faith exception to the exclusionary rule apply to the search of the Defendants' apartment and the

70

seizure of the items found therein.  For this proposition, the Magistrate Judge and the Government rely on <u>Leon</u>.  The Defendants assert that <u>Leon</u>'s good faith exception to the exclusionary rule does not apply to the facts in this case. [Doc. 85 at 12-20].  The Court begins by examining the <u>Leon</u> decision itself.

The issue presented in <u>Leon</u> was clear-cut: "whether the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause."  468 U.S. at 900.   Facing the Court were the "competing goals" of deterring present police misconduct and any future unreasonable privacy invasions by law enforcement versus concealing from the fact-finder truthful evidence of a defendant's guilt or innocence.   <u>Id.</u> at 900-01.

Ultimately, the Court concluded that, "in the Fourth Amendment context, the exclusionary rule can be modified somewhat without jeopardizing its ability to perform its intended functions."  <u>Id.</u> at 905.   The costs and benefits of the exclusionary rule are, respectively, that a guilty person may go unpunished when officials engaged in constitutional wrongdoing are called to task and their investigatory efforts cast aside. "If

exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers or the policies of their departments." Id. at 918.    On the other hand, if officers obtain a warrant in good faith, which is later determined to be insufficient due to no fault of the police, the deterrence rationale loses its force.  Or, as was stated by the Supreme Court earlier in United States v. Peltier, 422 U.S. 531, 539 (1975):

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused.

Having set forth purposes of the exclusionary rule, the Court then observed the constitutional directive that law enforcement officers obtain a search warrant from a neutral and detached magistrate.    While "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause," the Court felt that "the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination." Id. at 914 (citation omitted).   Having said that, the Court was quick to follow with its assertion

that deference to a magistrate's probable cause determination is "not boundless." Id.

The Court identified three areas where the suppression of evidence traditionally resulted following a review finding that a magistrate's probable cause determination was improper. First, when a magistrate's probable cause conclusion is founded upon "the knowing or reckless falsity of the affidavit on which that determination was based." Id. Second, when a magistrate presented with a warrant application failed to perform her neutral and detached function and instead served merely as a rubber stamp for the police. Id. Third, when a magistrate's probable-cause determination was based upon a bare-bones affidavit that did not "provide the magistrate with a substantial basis for determining the existence of probable cause." Id. at 915 (citation omitted). Critically, the Court pointed out that, in only those cases arising in the first situation – the police affiant's knowing or reckless disregard for the truth – had the Court explained its rationale for suppressing evidence, citing to its decision in Franks. Because the suppression of evidence pursuant to Franks was consistent with the goals of the exclusionary rule, the Leon Court unconditionally ratified its continuing viability. Id. at 923.

73

With regard to the second and third situations, however, the Court observed that the magistrate's error in issuing a search warrant may or may not have been dependent upon any untoward activities of the law enforcement officers seeking the warrant. Consequently, following the invalidation of a search warrant, courts must undertake a case by case analysis of the cause therefore to detect whether the reason stems from the acts or omissions of the magistrate signing the warrant or of the officers seeking it. Id. at 918. If law enforcement was complicit in the magistrate's erroneous probable cause assessment, the exclusionary rule would apply and any evidence obtained pursuant to the warrant would be suppressed. If, however, law enforcement officers, acting with objective good faith, obtained a warrant and thereafter conducted a search later held to be invalid due to the fault of the magistrate alone, the suppression of any evidence seized would not advance the constitutional interest involved. "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. at 921. Application of the exclusionary rule in such a situation would not be defensible.

In the end, the Leon Court concluded that suppression remained an appropriate remedy when properly applied. "The Court has, to be sure, not

seriously questioned, in the absence of a more efficacious sanction, the continued application of the rule to suppress evidence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate."  Id., 468 U.S. at 908-9 (citation omitted). In that vein, the Court set forth four general situations where the exclusionary rule remains available.  Id. at 923-5.  As explained by the Fourth Circuit,

> This "good faith" exception will be applied except in four limited situations: (1) when the affiant based his application on knowing or reckless falsity; (2) when the judicial officer wholly abandoned his role as a neutral and detached decision maker and served merely as a "rubber stamp" for the police; (3) when the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant was so facially deficient that the executing officers could not reasonably have presumed that the warrant was valid.

United States v. Wellman, 663 F.3d 224, 228-9 (4th Cir. 2011).

Three items in the Application were found to be improper.  The first two items, the information regarding the phantom dog alert and Rattler's identification of Defendant Wilson by name, were found to be false.  These fall within the first exception. As to the identification of Wilson, the officers knew the statement in the Application to be false.  With regard to the dog alert, even in the light most favorable to the Government, the statement in the Application was recklessly false.  These falsehoods contained in the Application were not minor inaccuracies "of peripheral relevancy,"

75

Rugendorf v. United States, 376 U.S. 528, 531-2 (1964), but material misrepresentations going to the heart of Judge Letts' neutral and detached role of assessing probable cause. The Supreme Court's rationale for excluding a situation such as this from Leon's good faith exception is simple: "[I]t would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." Leon, 468 U.S. at 914 n.12, citing Franks, 438 U.S. at 165.

The third item, the statements from the "Confidential Source," presents a more difficult problem. These statements were found to lack a corroborative underpinning. Regarding the good faith exception, this must be analyzed as to whether this lack of corroborative information so undermines the information the source provided that any finding of probable cause based thereon is unreasonable. If so, this would fall within the third exception. United States v. Doyle, 650 F.3d 460, 470 (4th Cir. 2011) (if a magistrate issues a warrant on the basis of nonconclusory statements that nonetheless fail to establish probable cause, the reasonableness of the officer's execution of the warrant is better analyzed under the third circumstance discussed in Leon). The mere insufficiency of the affidavit provision will not preclude the application of the good faith

76

exception, the issue is whether reliance on the same would be objectively reasonable.  Id.

In this instance, the paragraph is not a statement of conclusions devoid of any facts.  The failure lies not with what McCoy wrote but with what he failed to write.  The paragraph neither states that the CS was reliable nor gives any details by which the magistrate could independently determine that the CS was reliable or knew the substance about which he spoke. Further, absent from the Application was any explanation of the officers' efforts at corroborating the CS's allegations.  Again, these omissions did not stem from the lack of corroborating details.  The officers possessed a plethora of information they could have set forth in the application but did not.

Objectively speaking, at least since 1983 when the Supreme Court handed down its decision in Gates, a reasonable officer would know the importance of providing a magistrate "reliability" and "fund of knowledge" information concerning any informants the officer relies upon for establishing probable cause.   Likewise, a reasonable officer would know to include corroborating details to shore-up any deficiencies in an informant's background or knowledge base.   Detective McCoy was a seasoned officer,

77

a fourteen or sixteen year[23] veteran of the Jackson County Sheriff's department, having "typed and executed more than 50 search warrants." And, while the <u>Leon</u> Court eschewed sending "federal courts on an expedition into the minds of police officers" when conducting a good faith analysis, <u>Leon</u>, 468 U.S. at 922 n.23 (citation omitted), no such journey is necessary in this case. McCoy testified during Defendants' suppression hearing that he knew he had to include all such critical information in a warrant application.

Q. Exhibit 3 [Doc. 49-1 at 6-7, ¶6] only says that a CI was known by Detective Shiver and Detective Smith; correct?

A. Correct.

Q. It doesn't say -- this warrant that you put in front of Judge Letts doesn't tell Judge Letts anything about the veracity or reliability of that CI, does it?

A. I don't believe it does.

Q. Okay. It doesn't establish if Detective Shiver or Detective Stites knew the identity of the CI, does it?

A. No.

Q. And you certainly didn't know the identity of the CI?

A. I did not.

---

[23]"I, Detective Sgt. Patrick McCoy have been a law enforcement officer with the Jackson County Sheriff's Office for the past sixteen years." [Doc. 49-1 at 5]. "I have typed and executed more than 50 search warrants and have been on over 100 search warrants in all during my fourteen years with the Jackson County Sheriff's Office." [<u>Id.</u>].

Q. Okay. You've written a bunch of warrants in the past; right?

A. I have.

Q. You understand then, don't you, sir, that it's crucial for a magistrate to be able to independently verify the veracity and reliability of a confidential informant, isn't it?

A. Yes.

Q. Nothing in this document gave that information to Judge Letts regarding this CI, does it?

A. I don't believe so.

* * * * * * * * * * * *

Q. Okay. This doesn't say that they've ever worked with this CI; right?

A. That's correct.

Q. It doesn't say that they know this CI's identity, does it?

A. It does not.

Q. It doesn't say that this CI provided reliable and verifiable information in the past, does it?

A. It does not.

Q. And warrants you've written in the past -- you know, to put that information in warrants, don't you?

A. I have put it in warrants before.

Q. You didn't put it in this one, did you?

A. I did not.

79

* * * * * * * * * * * *

Q. But you've told me just previously you understand the crucial nature of that information for a magistrate in reaching an independent determination, don't you?

A. Yes.

Q. So this warrant, your application -- your application in here fails to provide that information to Judge Letts, doesn't it?

PROSECUTOR: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: It does.

(Hr'g Tr. 55, 57, 58; Jun. 20, 2013).

The offending paragraphs in the Application in this case clearly satisfied two of the four situations identified by the Court where Leon's good faith exception would not apply. The officers submitted a warrant application to Judge Letts containing intentional misrepresentations of fact. They failed to recite critical information concerning informants that they knew – that any objectively reasonable officer would know – should have been included in the application. But when the Court considers the totality of the circumstances leading to the Defendants' arrests, it becomes abundantly clear that the Court cannot ascribe "objective good faith" to the actions of the officers in this case.

Prior to the vehicle stop on October 11, 2012, the officers undertook precious little investigative work; most of the significant information came to them by way of informants whose allegations, in many respects, they failed to explore further. They stopped Wilson's car on September 19, 2012, to learn her name, but did so under legally questionable circumstances. One month later, knowing that they would find a reason to stop the Defendants' car on October 11, 2012, the officers contacted Cox to bring the drug dog from two counties away rather than enlist the help of any of the five closer drug dog detection teams. Due to the drug dog not having been trained to recognize the odor of oxycodone, Cox's statement that the dog had alerted was patently false and served only as a pretext to search the Mazda. It is no leap of faith to infer that an inexperienced K-9 handler was intentionally sought, from some distance away, to provide the legal key to unlock the Defendants' car. Then, when the search of the Mazda bore no fruit, the officers directed Sgt. Neadau to frisk the Defendants despite the fact that neither she, nor any of the other officers on the scene, felt any hint of apprehension that either Defendant was presently armed or dangerous. Thereafter, Smith, Stites, and Shiver selected McCoy, the officer with the least amount of knowledge or involvement in the entire investigation, the officer they called the very same day they wanted to apply for a search

warrant, as the Search Warrant Applicant. Such an ends-justifying-the-means approach does not manifest good faith adherence to constitutional principles.

All three of the defects found in the Application would appear to put it squarely within the exceptions to the good faith rule of Leon. Taking the Application as a whole, and viewing the totality of the circumstances, the Court is compelled to find that these defects manifest a lack of good faith reliance on the part of the officers. As such, the items seized pursuant to the invalid Warrant must be suppressed. This is done with the hope that it will "instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused." Peltier, 422 U.S. at 539.

## CONCLUSION

Based upon the Court's *de novo* review of this matter, and for the reasons stated, the Court determines that Magistrate Judge Howell's proposed findings and conclusions are modified as set forth herein by this Court. Accordingly, the Court will accept the Magistrate Judge's conclusion with regard to the search of the Defendants and grant their suppression motions with regard to the drugs seized from their persons. The Court will reject the Magistrate Judge's conclusion regarding the treatment of the

82

evidence seized from the Defendants' apartment pursuant to the Search Warrant issued on October 11, 2012.  Specifically, and for the reasons stated herein, the Court will find the Search Warrant issued in the case lacked probable cause and further that the officers obtaining and executing the Warrant had no good faith basis to rely upon the Warrant.

**IT IS, THEREFORE, ORDERED** that the Defendants' Motions to Suppress [Docs. 39, 42] are **GRANTED.**

**IT IS SO ORDERED.**

Signed: January 20, 2014

Martin Reidinger
United States District Judge